**Marvin K. HAMMON, et al., Plaintiffs,**

v.

**Marion S. BARRY, Jr., et al., Defendants.**

**Kevin Michael BYRNE, et al., Plaintiffs,**

v.

**Theodore R. COLEMAN, et al., Defendants.**

**UNITED STATES of America, Plaintiff,**

v.

**The DISTRICT OF COLUMBIA, et al., Defendants.**

**Civ. A. Nos. 84–0903, 85–0782 and 85–0797.**

United States District Court, District of Columbia.

April 1, 1985.

Joan A. Burt, Karl W. Carter, Jr., Washington, D.C., for Hammon plaintiffs.

George H. Cohen, Michael H. Gottesman, Robert M. Weinberg, Jeremiah A. Collins, Mady Gilson, Bredhoff & Kaiser, Washington, D.C., for Byrne plaintiffs.

Richard S. Ugelow, David L. Rose, Dept. of Justice, Washington, D.C., Also on brief: Wm. Bradford Reynolds, Associate Atty. Gen., Joseph E. diGenova, U.S. Atty., Royce C. Lamberth, Asst. U.S. Atty., Washington, D.C., for The United States, through Atty. Gen. Edwin Meese, III.

Inez Smith Reid, Corp. Counsel, John H. Suda, Principal Deputy Corp. Counsel, Martin L. Grossman, Deputy Corp. Counsel, Sandra Jefferson Grannum and George C. Valentine, Asst. Corp. Counsel, Washington, D.C., Also present: Herbert Reid, Sp. Counsel to the Mayor, Washington, D.C., for defendants.

Richard T. Seymour, Lawyers' Committee for Civil Rights Under Law, Barry L. Goldstein, NAACP Legal Defense and Educational Fund, Inc. Also on brief: William L. Robinson, Lawyers' Committee for Civil Rights Under Law, Roderic V.O. Boggs, Washington Lawyers' Committee for Civil Rights Under Law, Julius LeVonne Chambers and Elaine R. Jones, NAACP Legal Defense and Educational Fund, Inc., Washington, D.C., amici curiae.

## OPINION

CHARLES R. RICHEY, District Judge.

### INTRODUCTION

This case, which is before the Court on cross-motions for summary judgment, calls into question the legality and constitutionality of a proposed affirmative action plan voluntarily adopted by a public employer, the District of Columbia and its Fire Department. This a situation, involving a voluntary plan by a public employer, has never before been addressed by the Supreme Court, which expressly reserved decision on this question *in United Steelworkers of America v. Weber*, 443 U.S. 193, 200, 99 S.Ct. 2721, 2725, 61 L.Ed.2d 480 (1979), and again last term in *Firefighters Local Union No. 1784 v. Stotts*, —— U.S. ——, 104 S.Ct. 2576, 2590, 81 L.Ed.2d 483 (1984).

The proposed plan at issue contains procedures based largely on race and gender at both the hiring and promotion levels, designed to increase minority participation in the D.C. Fire Department. For the reasons stated in this Opinion, the Court finds that the hiring aspects of the plan satisfy the minimal requirements of Title VII and the Constitution, but that the promotion aspects cannot survive Title VII scrutiny. Accordingly, the Court cannot approve the plan as submitted.

### PROCEDURAL HISTORY

On October 29, 1980, Theodore O. Holmes, President of the Progressive Fire Fighters Association of Washington, D.C., filed a complaint in the District of Columbia Office of Human Rights ("OHR") charging race discrimination in recruitment, hiring, promotion and administrative

practices of the District of Columbia Fire Department. The next day, Jon F. Sheffield, in his capacity as Vice-President of the Black Fire Officers Association, filed a similar complaint. The respondents to both complaints were the City Administrator, the Director of Personnel, and the Chief of the D.C. Fire Department. The complainants alleged that the respondents were engaging in patterns and practices of race discrimination against blacks in the operation of the Department.

After several procedural steps, the case was assigned to Hearing Examiner Patrick Kelly. On October 23, 1981, Hearing Examiner Kelly permitted Local 36, International Association of Fire Fighters ("Local 36") to intervene in the action. Local 36 is a representative of employees in the uniformed force of the District of Columbia Fire Department in the ranks of Firefighter through Captain.

During the period from December 3, 1981 through April 6, 1982, Hearing Examiner Kelly conducted a 50 day public evidentiary hearing in the Holmes and Sheffield cases. In addition to the complainants and respondents, Local 36 fully participated in the hearing. On July 19, 1982, Hearing Examiner Kelly issued proposed findings of fact, conclusions of law, and recommendations. On October 7, 1983, after more complications, the Hearing Examiner finally submitted his corrected version of his findings of fact, legal conclusions, and recommendations to Appellate Officer E. Veronica Pace. All of the Hearing Examiner's findings and conclusions were accepted by the District of Columbia and the Fire Department. Appellate Officer Pace also reviewed the Hearing Examiner's report, and, with minor modifications, she accepted his recommendations. No review was sought by any party of Appellate Officer Pace's November 16, 1983 Order, and that Order constitutes OHR's final decision in the Holmes and Sheffield cases.

Hearing Examiner Kelly had found that the 1980 entry level written examination had an adverse impact on blacks and was not a valid predictor of job performance as required by the Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. § 1607.4(D) ("Uniform Guidelines"). This adverse impact only becomes clear when candidates are selected in numerical order based on their test scores, because, as shown below, such rank order use resulted in a disproportionately low selection rate for blacks.

The pass rate of the 1980 entry level test did not result in such an adverse impact. There were 974 test takers, of whom 724 (74.35%) were black and 207 (21.5%) were white. Of that number, 958 passed the examination, 713 (74.35%) of whom were black and 205 (21.5%) were white. Hearing Examiner Kelly found that if selections were made in rank order, however, the following would have resulted:

For the first 100 names on the eligible list, the selection rate for blacks would be 3.6% and for whites 34%;

for the first 200 names on the eligible list, the selection rate for blacks would be 11.2% and for whites 54%;

for the first 300 names on the eligible list, the selection rate for blacks would be 20.8% and for whites 69.4%.

The Hearing Examiner recommended, in pertinent part, that the entry level examinations be validated in accordance with the Uniform Guidelines; that the City exhaust the 1980 eligibility list; that all persons appointed from the 1980 list receive the same date of hire, irrespective of their actual date of employment; and that the Fire Department adopt and implement an Affirmative Action Plan. As previously noted, these recommendations were adopted by Ms. Pace in the final decision in OHR Docket Nos. 81–DC–029 and 81–DC–041.

On March 22, 1984, four black applicants for hire with the Fire Department, and the Progressive Firefighters Association, filed suit in this Court against the Mayor of the District of Columbia, the Director of the D.C. Office of Personnel, and the Fire Chief. *Hammon v. Barry*, C.A. 84–0903. The complaint sought, *inter alia*, enforcement of the November 16, 1983 Final Order issued by Appellate Officer Pace in the

OHR proceedings. The plaintiffs included a request for a temporary restraining order seeking to prohibit the defendants from administering the entry-level test in March, 1984. On March 23, 1984, after hearing arguments on the motion, the Court denied the restraining order.

On May 23, 1984, this Court entered a Consent Decree in the *Hammon* case. In the Consent Decree the defendants agreed to validate an entry level firefighter examination in accordance with the Uniform Guidelines, to submit a proposed affirmative action plan to the Court and to OHR, and to validate other components of the firefighter selection process. The Consent Decree also authorized the defendants to hire from the 1984 entry level examination list only after exhausting the 1980 eligible list. Paragraph 11 of the Decree made clear that it was "neither an admission nor a finding that the defendants have violated any law or regulation regarding prohibited discrimination."

On February 7, 1985, pursuant to paragraph 5 of the Consent Decree, the Fire Department submitted to the Court the Affirmative Action Plan ("AAP", or "plan") at issue. The defendants at that time reported to the Court that the plan was already in effect.

On March 8, 1985, the Fire Chief promoted five black firefighters to the rank of Sergeant. These promotions were made pursuant to page 54 of the plan, which states that the Fire Department shall promote "the five highest-ranking Blacks who had not been promoted from the 1982 Register", and that these promotions shall be made retroactive to October 15, 1984. Because there were several higher-ranking whites, these black firefighters would not have been promoted to Sergeant from the 1982 promotion list but for their race. (Joint Stipulation ¶ 70.)

That same day, March 8, 1985, eight white incumbent firefighters and Local 36 filed a complaint against the Fire Chief, the District of Columbia, and certain named officials challenging the promotion provisions of the AAP. *Byrne v. Coleman*,

C.A. No. 85–0782. The complaint, based on Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, 42 U.S.C. §§ 1981 and 1983, and the Fifth Amendment to the Constitution of the United States, alleges that the promotion provisions of the plan are illegal and unconstitutional because they contain racial preferences.

On March 11, 1985, the United States, through the Attorney General, filed a complaint against the District of Columbia and certain named officials alleging a pattern or practice of employment discrimination in violation of Title VII and the Fifth Amendment to the Constitution. *United States v. The District of Columbia*, C.A. No. 85–0797. The United States action contends that the short-term hiring and promotion provisions of the plan violate Title VII or the Fifth Amendment by requiring preferences based on race, color, or sex.

At a status conference held on March 12, 1985, the Court made clear that under paragraph 5 of the Consent Decree, the plan promulgated by the city was not in effect, regardless of the city's contention, as that paragraph required prior approval of the Court. Therefore, under the clear terms of the Consent Decree, which was signed by the Corporation Counsel, there is no plan now in effect. By Order of March 14, 1985, the Court consolidated the three cases. Due to the urgent nature of this case, and the Court's concern for the health and safety of the city's residents, of all races, which have been placed at risk by the lack of a full complement of firefighters, the Court placed the parties' counsel on an expedited schedule, culminating in a lengthy hearing on March 23, 1985. All counsel are to be congratulated for their cooperation and professionalism in helping to bring this complicated series of cases to a conclusion in less than one month.

## THE RACIAL COMPOSITION OF THE FIRE DEPARTMENT

None of the parties herein dispute that for many years the District of Columbia Fire Department discriminated against blacks. The Department's policy of segre-

gation is evidenced by a November, 1953, "Policy Order of the District of Columbia Regarding Non-Discrimination", issued by the Commissioners of the District of Columbia. The Policy Order seemed to establish laudable criteria to be considered by government officials in making personnel decisions. Section II of the Order stated:

each Government Official shall base all personnel actions taken or ordered by him solely on merit and fitness of the individual without regard to race, religion, color, ancestry, or national origin.

The Order, however, further stated that it:

shall not at this time govern the assignment of a colored employee or official to a white company of the firefighting division of the Fire Department or the assignment of a white employee or official to a colored company of the firefighting division.

The current statistics demonstrate that there still exist some vestiges of the aforementioned past discrimination. As of April 1, 1984, there were 1,277 uniformed members of the District of Columbia Fire Department, of whom:

786 (61.8%) were white males

472 (37.0%) were black males

2 (0.1%) were Hispanic males

2 (0.1%) were American Indian males

12 (1.0%) were Black females

1 (0.08%) was an American Indian female

2 (0.1%) were white females.

As of that same date, the officer ranks of the Fire Department had the following racial composition:

*Sergeant:*

54 (68.4%) white males

25 (31.6%) black males

*Lieutenant:*

85 (70.8%) white males

35 (29.2%) black males

*Captain:*

54 (85.7%) white males

10 (15.6%) black males

*Battalion Fire Chief:*

29 (80.6%) white males

7 (19.4%) black males

*Deputy Fire Chief:*

5 (71.4%) white males

2 (28.6%) black males

*Assistant Fire Chief:*

1 (50%) white male

1 (50%) black male

*Fire Chief:*

1 (100%) black male

As of April 1, 1984, the salary ranges of the Department uniformed members were as follows:

(a) $16,000–19,999 range—135 employees

45 (33.3%) white males

84 (62.2%) black males

6 (4.4%) black females

(b) $20,000–24,999 range—380 employees

213 (56.1%) white males

155 (40.8%) black males

1 (0.3%) Hispanic male

2 (0.5%) American Indian males

6 (1.6%) black females

1 (0.3%) American Indian female

2 (0.5%) white females

(c) $25,000–32,999 range—616 employees

412 (66.9%) white males

203 (33.0%) black males

1 (0.2%) Hispanic male

(d) $33,000 plus range—146 employees

115 (78.8%) white males

31 (21.2%) black males

## THE AFFIRMATIVE ACTION PLAN

As previously stated, the Final Order in the administrative *Holmes* and *Sheffield* cases recommended that the Fire Department adopt an affirmative action plan. In the May 23, 1984 Consent Decree in the *Hammon* proceedings, the District agreed to submit a plan for the Court's approval. This action is in furtherance of the mandate of D.C.Code § 1–508, which states that:

Every District government agency shall develop and submit to the Mayor and Council an affirmative action plan.

This statute was part of D.C.Law 1–63, which was passed by the City Council in

1976. Another part of that law is now codified at D.C.Code § 1–507:

> The goal of affirmative action in employment throughout the District government is and must continue to be, full representation, in jobs at all salary and wage levels and scales, in accordance with the representation of all groups in the available work force of the District of Columbia, including, but not limited to, Blacks, Whites, Spanish-Speaking Americans, Native Americans, Asian Americans, females and males. As used in §§ 1–507 to 1–514, "available work force" means that total population of the District of Columbia between the ages of 18 and 65.

The stated long-term goal of the District's AAP reflects the objectives set forth in this statute. The plan purportedly covers the period of October 1, 1984 through October 1, 1986. The plan contains separate procedures for the hiring and promotion of firefighters (which procedures are known as the short-range goals).

### A. Hiring Aspects.

Because the Court denied the *Hammon* plaintiff's request for a temporary restraining order, the Department conducted an entry-level examination in March, 1984. Some persons desiring to take the March examination were denied that opportunity because of limited seating capacity. Pursuant to paragraph 3 of the Consent Decree, the examination was again administered in April and July, 1984.

Like the 1980 test which Hearing Examiner Kelly found not to be valid or job-related, the 1984 entry level examination had an adverse impact on blacks if selections were made on the basis of rank order. Indeed, the 1984 test was substantially the same as the 1980 test. Only one component of the test, "following oral directions," was revised. To reduce the adverse impact of the 1984 test, the pass point was set at a level which met the 80% rule of thumb for determining adverse impact, as discussed in the EEOC Uniform Guidelines on Employee Selection Procedures. *See* 29 C.F.R. § 1607.-4(D).

A total of 1,626 persons took the test in 1984, of whom 1,050 (64.6%) were black, 492 (30.3%) were white, and 84 (5.1%) were Hispanic or others. Of those 1,626 who took the test, a total of 1,384 persons passed the examination, of whom 830 (60%) were black, 486 (35.1%) were white, 33 (2.4%) were Hispanic, and 35 (2.5%) were others. Of those who passed, 1,287 (93%) were males and 96 (6.9%) were females. The examination has not been validated, and there is no evidence demonstrating that those who score higher on the examination are more likely to perform better on the job than those who score lower on the test. (Joint Stipulation ¶ 29). This is consistent with the findings of Hearing Examiner Kelly.

The adverse impact of the 1984 test becomes apparent if selections were to be made on the basis of rank order. Rank order use would result in the following selections:

—of the first 100 passing applicants, 79 white males, 12 black males, 3 white females, 4 Hispanic males, 1 Hispanic female, and 1 unspecified male;

—of the next 100 passing candidates, 67 white males, 24 black males, 2 white females, 2 black females, 2 Hispanic males, 3 unspecified males;

—of the next 100 passing candidates, 55 white males, 36 black males, 2 white females, 1 black female, 2 Hispanic males, and 4 unspecified males;

—of the next 100 passing candidates, 52 white males, 37 black males, 3 white females, 4 black females, 1 Hispanic male, 1 Hispanic female, and 2 unspecified males.

Because rank order use results in this adverse racial impact, the AAP mandates a procedure for proportional appointment to the Department of test passers based on race, sex, and national origin. These procedures are designed solely to eliminate the racial, sexual, and ethnic disparity which would exist if the candidates were selected in rank order of examination results.

Under the plan, candidates are placed on 12 certificates (lists), each consisting of approximately 120 candidates. These certifi-

cates derive from separate lists of white males, white females, black males, black females, Hispanic males, and other males based upon the candidates' scores on the written examination (plus veteran's preference points). The plan directs that each certificate approximate the pass rate for blacks, whites, Hispanics, others, and females, *i.e.*, 60% black, 35.1% white, 2.4% Hispanic, 2.6% other, and 7% female. Finally, according to the AAP, candidates must be selected from the certificates in a manner which assures that the composition of each academy class is 60% black and 5% female.

B. *Promotional Aspects.*

The AAP attempts to remedy the perceived disparity among whites and minorities at the supervisory level by setting "short-range goals" at each level of rank. These goals refer to promotions to be made during the two-year period of the life of the 1984 promotions register. They are as follows:

Sergeant—13 Blacks (29%) out of 45 promotions

Lieutenant—10 Blacks (30%) out of 33 promotions

Captain—17 Blacks (63%) out of 27 promotions

The AAP requires that promotions be made on the basis of the "Rule of Nine Plus." This rule requires that for the total number of positions to be filled, the Fire Chief shall submit nine additional names to the Promotion Board. For example, if there are three positions to be filled, the Fire Chief shall submit twelve names for consideration. These names are to be submitted in rank order.

After the Promotion Board has made its evaluation of the candidates submitted by the Fire Chief, it will recommend back to him only the number of qualified individuals needed to fill the positions. The plan then requires that in selecting the candidates to refer to the Chief, the Promotion Board will consider the short-range goals of the affirmative action plan. When the

actual recommendations are made, the Promotion Board must also submit to the Fire Chief an explanation of how these promotions will impact upon the achievement of the short-range goals. The plan states that the Promotion Board should consider these short-range goals as a factor in every promotional decision during the two-year life of the plan.

The Fire Chief is directed to reject the recommendations of the Promotion Board only when the justification given is inconsistent with the short-range goals. In an attempt to avoid repeated denial of an individual's promotion, the plan provides that no individual shall be passed over more than four times during the two-year period of the 1984 promotional list due to the short-range goals. The Fire Department EEO Officer shall submit to OHR a report only on the impact on minority and female representation of each set of candidates submitted to and approved by the Fire Chief. Finally, the plan states that this process will remain in effect until a new promotional process has been established.[1] There is no indication of when such a new system is to be in place, but it is assumed that this process will expire along with the plan itself in October, 1986.

The plan also calls for the one-time promotion of the five highest-ranking Blacks who had not been promoted from the 1982 register, retroactive to October 15, 1984. The City attempted to justify this as a remedy for the alleged adverse impact the City felt to have resulted from the 1982 Sergeant promotion process. As noted above, this promotion took place on March 8, 1985, and was the impetus for both the *Byrne* and *United States* actions.

## ANALYSIS

I. THE HIRING ASPECTS OF THE PLAN ARE BOTH LEGAL AND CONSTITUTIONAL.

A. *Title VII Analysis.*

Analysis of any voluntary affirmative action plan must begin with *United Steel-*

---

1. This aspect of the plan again does not seem to take cognizance of ¶ 5 of the Consent Decree

which makes clear that the Court is the ultimate arbiter of the validity of the plan.

*workers of America v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), where the Supreme court held that Title VII does not prohibit race-conscious affirmative action plans adopted by private employers. Although the holding in *Weber* was specifically limited to employers in the private sector, 443 U.S. at 200, 99 S.Ct. at 2725, its Title VII analysis has been routinely extended to public employers. *E.g. Vanguards of Cleveland v. City of Cleveland*, 753 F.2d 479, 484 (6th Cir.1985); *Janowiak v. Corporate City of South Bend*, 750 F.2d 557, 561 (7th Cir.1984); *Johnson v. Transportation Agency, Santa Clara County, California*, 748 F.2d 1308, 1309 (9th Cir.1984); *Bushey v. New York State Civil Service Commission*, 733 F.2d 220 (2d Cir.1984), *cert. denied*, — U.S. —, 105 S.Ct. 803, 83 L.Ed.2d 795 (1985).

Prior to 1974, the employer in *Weber*, Kaiser Aluminum & Chemical Corp., had a plant with a skilled craftworker force of 273 persons, only 5 of whom (1.83%) were black. The local work force, however, was 39% black. To remedy this conspicuous racial imbalance, Kaiser and the union entered into a collective-bargaining agreement which contained an affirmative action plan. Kaiser established a training program to train its production workers to fill craft openings. Production workers were admitted into the training program on the basis of seniority, with the proviso that at least 50% of the new trainees were to be black. This procedure was to be in effect until the percentage of black craftworkers in the plant approximated the percentage of blacks in the local labor force.

The Supreme Court upheld the plan, even though it was race-conscious. Although the *Weber* Court declined to "define in detail the line of demarcation between permissible and impermissible affirmative action plans", 443 U.S. at 208, 99 S.Ct. at 2729, the Court identified certain reasons why the Kaiser plan was permissible. First, the Kaiser plan was "designed to break down old patterns of racial segregation and hierarchy". *Id.* Secondly, the plan did not "unnecessarily trammel the interests of the white employees" because

(1) it did not require their discharge, and (2) it did not create an absolute bar to their advancement, in that 50% of the trainees would be white. *Id.* Finally, the plan was temporary because it would end as soon as the percentage of black skilled craftworkers approximated the percentage of blacks in the local labor force. *Id.* at 208–09, 99 S.Ct. at 2729–30. As shown below, the factors which made the Kaiser plan acceptable are present in the hiring portions of the Fire Department's AAP.

### 1. The Remedial Nature of the Instant Plan.

The District's hiring plan is designed to break down an old pattern of racial segregation and hierarchy. The record indicates that, in the past, the Department's companies were officially segregated. Moreover, a review of the salary ranges indicates that a racial hierarchy still prevails. Thus, the situation is not unlike that in *Weber*, where the Court took judicial notice of the history of racial segregation in crafts, which in large part contributed to the racial imbalance in that case. 443 U.S. at 198 n. 1, 99 S.Ct. at 2724 n. 1.

The *Weber* Court also looked to the racial composition of the 1974 craftworker force, and found that the statistical evidence of racial imbalance satisfied this first requirement that the plan be remedial in nature. *Id.* at 208, 99 S.Ct. at 2729. *Accord, Bushey v. New York State Civil Service Commission*, 733 F.2d 220, 228 (2d Cir.1984), *cert. denied*, — U.S. —, 105 S.Ct. 803, 83 L.Ed.2d 795 (1985). Although blacks comprised 39% of the local labor force, they comprised only 1.83% of the plant's craftworker force. This disparity seemed to satisfy the Court that there was a need for some affirmative action. *Lehman v. Yellow Freight System, Inc.*, 651 F.2d 520, 527 (7th Cir.1981).

In the present case, as of April 1, 1984, white males comprised 61% of the Fire Department's uniformed force, while black males comprised only 37% of the uniformed force. This much is common ground. The

parties disagree, however, as to the definition of the relevant labor market, to which these figures must be compared. The Justice Department took no position on the proper labor market. Defendants stress that the population figures for the District of Columbia should control. The *Byrne* plaintiffs contend that the Washington Standard Metropolitan Statistical Area ("WSMSA") is the relevant labor market.[2] *Amici* urge the Court to examine the applicant flow data. The Court considers each point in turn.

*(a) The Defendant's Position.*

The District premises its assertion that District of Columbia statistics should determine the relevant labor market on a D.C. statute which requires all District employees to become residents of the City within 180 days after hire. 1 D.C.Code § 608.-1(e)(1). Many courts, the defendants continue, have looked to the City, which is the area served by police and fire departments, to determine if there is sufficient evidence of prior discrimination. *League of United Latin America Citizens v. City of Santa Ana*, 410 F.Supp. 873, 896 (C.D.Cal.1976) (citing cases). The City may choose to employ only local residents, *McCarthy v. Philadelphia Civil Services Commission*, 424 U.S. 645, 96 S.Ct. 1154, 47 L.Ed.2d 366 (1976), and indeed, in this case, the D.C. government has imposed a D.C. residency requirement within 180 days after hire, 1 D.C.Code § 608.1(e)(1). For these reasons, the defendants stress that the D.C. population is the appropriate benchmark.

Using District of Columbia figures, one could find racial and sexual disparities in the Fire Department's uniformed force. According to the 1980 Census, the population of persons between the ages of 18 and 65 residing in the District of Columbia is as follows:

30.8% black males; 33.3% black females; 15.8% white males; 15.8% white females;

These statistics must be compared to the composition of the Fire Department. As of April 1, 1984, there were 1,277 uniformed members of the District of Columbia Fire Department, with the following racial breakdown:

37.0% black males; 1.0% black females; 61.6% white males; 0.1% white females.

Thus, using population statistics for the District of Columbia only, it is clear that there is at least some disparity between the numbers of blacks and females in the Fire Department as compared to those in the City.

*(b) The Byrne Plaintiffs' Position.*

The *Byrne* plaintiffs contend that the proper statistical base is the WSMSA, which includes suburban areas surrounding Washington. This contention is based on the parties' stipulation that, even after the residency requirement went into effect in 1980, a substantial portion of the Department's applicants have come from the suburban areas. For example, during the period from June 1, 1982 through May 30, 1983, 49.5% of the new hires were from Maryland or Virginia. Like the defendants, the *Byrne* plaintiffs can cite some authority for using their statistical base. *Stone v. FCC*, 466 F.2d 316, 322 (D.C.Cir. 1972); *Williams v. City of New Orleans*, 729 F.2d 1554, 1562 (5th Cir.1984) (*en banc*); *EEOC v. Local 14, Operating Engineers*, 553 F.2d 251, 254 (2d Cir.1977); *Drayton v. City of St. Petersburg*, 477 F.Supp. 846, 857–58 (M.D.Fla.1979).

Using WSMSA figures, the Department's work force does not present a picture of black underrepresentation. According to the 1960 Census, 25.7% of the persons between the ages of 20 and 29 in the WSMSA were black.[3] By 1970, the percentage of blacks between 20 and 29 was 24.4%. The 1980 Census demonstrates that 29.3% of the persons between the ages of 20 and 29 in the WSMSA were black. If

---

**2.** Although the *Byrne* plaintiffs do not challenge the hiring aspects of the AAP, their discussion about the relevant labor market is equally applicable to the hiring and promotion aspects.

**3.** Only persons between the ages of 20 to 28 are eligible to be hired into the uniformed force of the Department. (Joint Stipulation ¶ 14).

these figures accurately portray the relevant labor market, the 38% black figure for uniformed members of the Fire Department would not justify a finding of racial imbalance.

### (c) Amici's Position.

■ Amici asserts that the applicant flow data justify the AAP's figure of 60% black hirees. The Court agrees. ⸱ The Fourth Circuit has stated that applicant flow data are "the most salient proof" of the relevant labor market. *United States v. County of Fairfax*, 629 F.2d 932, 940 (4th Cir.1980), *cert. denied*, 449 U.S. 1078, 101 S.Ct. 858, 66 L.Ed.2d 801 (1981). The Supreme Court has stated that the applicant flow is highly relevant evidence of an employer's labor market. *Hazelwood School District v. United States*, 433 U.S. 299, 308 n. 13, 97 S.Ct. 2736, 2741 n. 13, 53 L.Ed.2d 768 (1977). *Accord, Payne v. Travenol Laboratories, Inc.*, 673 F.2d 798, 823–24 (5th Cir.), *cert. denied*, 459 U.S. 1038, 103 S.Ct. 451, 74 L.Ed.2d 605 (1982).

According to the applicant flow, 74.35% of the 1980 test-takers, and 64.6% of the 1984 test-takers, were black. In light of these figures, the Court finds that the plan's hiring quota of 60% blacks is reasonable, particularly for a short period. The Justice Department took no position as to which statistical basis was proper.

■ In addition to statistical evidence, the District has relied on an administrative finding to justify the plan. Hearing Examiner Kelly found that the 1980 entry level examination had an adverse impact on black applicants, and that it was not job related.[4] The 1984 test was substantially the same examination. The hiring aspects of the plan were designed to reduce this adverse impact. This administrative finding, together with the statistical evidence, establish a justification for corrective, race-conscious remedies such as those contained in the hiring aspects of the plan. *See University of California Regents v. Bakke*, 438 U.S. 265, 307–08, 98 S.Ct. 2733, 2757, 57 L.Ed.2d 750 (1978) (opinion of Powell, J.) (administrative findings of statutory violations may justify race-conscious remedial steps). *See also, e.g., Johnson*, 748 F.2d at 1313 ("it is sufficient for an employer to show a conspicuous imbalance in its work force" to meet the *Weber* requirement that the plan is remedial).

### 2. The Interest of White Applicants.

■ The Supreme Court upheld the plan in *Weber* because it did not "unnecessarily trammel" the interests of the white employees. 443 U.S. at 208, 99 S.Ct. at 2729. No whites would be discharged, and, because 50% of the training programs were to be filled by whites, the plan did not create an absolute bar to their advancement.

If anything, the hiring portions of the Fire Department's AAP constitute less of an infringement on the interests of whites than did the Kaiser plan. First, like the plan in *Weber*, no whites will be discharged. Secondly, this plan does not prohibit the hiring of whites; instead, with the enrollment of each certificate, the same proportion of whites will be hired as passed the exam. Finally, at the entry level, those whites whose employment with the Department is either denied or delayed are merely applicants for positions. *They have little expectation or entitlement to a job with the Fire Department, despite their passing the hiring examination. Cf. United Building & Construction v. Mayor & Council of Camden*, 465 U.S. 208, 104 S.Ct. 1020, 1028, 79 L.Ed.2d 249 (1984) ("there is no fundamental right to government employment for purposes of the

---

**4.** This administrative finding distinguishes this case from *Janowiak v. Corp. City of South Bend*, 750 F.2d 557, 562 (7th Cir.1984), which held that "an employer must proffer something more than a finding of a statistical disparity ... to justify the adoption of an affirmative acton program." Here the District proffers, in addition to the statistical disparity, an administrative finding that its entry level test adversely affects blacks, and it has adopted a plan, based on race, gender or national origin only, to correct that adverse impact. *Janowiak* has nothing to say about such a situation.

Equal Protection Clause"). The Court finds significance in the distinction between a procedure which denies a job to an applicant, who has little expectation of being hired, and one which denies a benefit to an incumbent employee, who has established some time in rank. This plan does not "trammel" on the interests of the white applicants, who have little in the way of protectible interests in terms of getting a job in the first place. *Accord, Vanguards,* 753 F.2d at 484 (the Sixth "Circuit has repeatedly indicated that a simple reduction in non-minority 'expectations' does not necessarily make a consent decree unfair or unreasonable").

### 3. Temporariness.

■ The plan in *Weber* was held to be sufficiently temporary in that it was only to continue until the percentage of black craftworkers approximated the percentage of blacks in the relevant labor market. 443 U.S. at 208–09, 99 S.Ct. at 2729–30. In 1974, when the plan was instituted, the Kaiser plant had 273 craftworkers, only 5 of whom were black. 443 U.S. at 198, 99 S.Ct. at 2724. During 1974, the first year of operation of the plan, 13 employees were selected for the training program, seven of whom were black and six of whom were white. If this figure even remotely approximated the average number of yearly openings, mathematics tells us that the Kaiser plan was to continue considerably longer than the plan before the Court today. The Fire Department's plan will end on October 1, 1986, some eighteen months from now.

In addition to the Supreme Court, many other courts have approved affirmative action plans in effect longer than the one at issue here. *E.g., Johnson,* 748 F.2d at 1312 (indeterminate); *Vanguards,* 753 F.2d at 479, 485 (6th Cir.1985) (4 years). Accordingly, the Court holds that the Fire Department's AAP meets the *Weber* requirement that it be temporary.

### 4. Consideration of Alternatives.

■ The Court of Appeals for this Circuit has established guidelines regarding the imposition of racial quotas. *Segar v. Smith,* 738 F.2d 1249, 1294 (D.C.Cir.1984); *Thompson v. Sawyer,* 678 F.2d 257, 294 (D.C.Cir.1982). The discussion in these cases just cited occurred in the context of court-imposed quotas as remedies after judicial findings of discrimination. Although that context differs somewhat from that of the present case, namely, judicial approval of a voluntary plan incorporated in a consent decree, the Circuit Court's guidelines are nonetheless instructive.

In *Thompson,* 678 F.2d at 294, the court stressed that district courts "should consider whether alternative, equally effective methods could supplement or supplant resort to a quota." *Accord, Segar,* 738 F.2d at 1294. The Court now addresses these considerations.

The Fire Department's AAP nowhere indicates that the government considered alternatives to the quotas contained therein. The question of feasible alternatives, however, arose at oral argument. Upon consideration of one alternative to the hiring aspects of the plan, a physical agility test[5] apparently suggested by the United States, the Corporation Counsel stated that such an alternative might have an adverse impact on women. (Tr. at 90). *Cf. Dothard v. Rawlinson,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977). Additionally, the Corporation Counsel indicated that the City feared possible liability in the event someone would be injured in such an agility test. (Tr. at 90–91). Counsel also stated that a lottery had been suggested, but that suggestion was rejected due to Congressional opposition. (Tr. at 91). The Court notes that such a lottery, in the form of random selection from the ranks of those who passed the entry-level test, would not provide any reward for a high score on the test. Even though the test is not proven to

---

5. While the hiring aspects of the AAP minimumly pass the *Weber* analysis, the Court suggests that on remand the city consider whether use of

physical agility or strength test would make the hiring portion of the plan *more* than just minimumly acceptable under these standards.

be job-related, the Court feels that there should be some incentive to do well, particularly in light of the reality that it is *not* difficult to pass.[6] Thus, as compared to the lottery suggestion, the plan better rewards the efforts of those who score well on the examination, and presents a more feasible solution to the problem.

Aside from the physical agility test, which was apparently suggested by the United States (Tr. at 90), none of the parties suggested any alternatives to the AAP's hiring quotas. The City would have been well-advised to have included in the AAP some mention of its consideration of alternatives, *cf. Thompson, supra,* and the Court is concerned that reasonable alternatives were not seriously discussed.[7] In light of the absence of any clear options, the hiring aspects of the plan cannot be struck down in favor of less objectionable alternatives.

### 5. The Effect of Stotts.

Nothing in *Firefighters Local Union No. 1784 v. Stotts,* —— U.S. ——, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984), compels rejection of the hiring aspects of the plan. In *Stotts,* black plaintiffs and the Fire Department had entered a consent decree for the stated purpose of remedying the Department's hiring and promotion practices with respect to blacks. Without admitting discrimination, the consent decree established an interim hiring goal of 50% of the Department's job vacancies with qualified blacks, and it attempted to ensure that 20% of the promotions in each job category be given to blacks. The consent decree contained no provision for layoffs, but by virtue of an earlier consent decree, seniority was to be computed, for the purposes of promotion, transfer, and assignment, "as the total seniority of that person with the City."

Financial troubles ensued for the City, and it had to lay off many employees. Layoffs were to be based on the "last hired, first fired" rule, pursuant to the seniority system. If a senior employee's position were eliminated, he could "bump down" to a lower ranking position. Because these layoffs would adversely affect blacks, the district court enjoined this layoff plan "insofar as it will decrease the percentages of black" employees. Thus, some non-minority employees with more seniority than minority employees were laid off or demoted.

The Supreme Court held that the injunction was improper, and could not be justified as an effort to either modify or enforce the consent decree. The court could not order the violation of a bona fide seniority system because § 703(h) of Title VII "permits the routine application of a seniority system absent proof of an intention to discriminate." 104 S.Ct. at 2587, citing *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 352, 97 S.Ct. 1843, 1863, 52 L.Ed.2d 396 (1977). The majority, however, declined to decide the question most pertinent to this case:

> Whether the City, a public employer, could have [adopted an affirmative action plan] without violating the law is an issue we need not decide. The fact is that in this case the City took no such action and that the modification of the decree was imposed over its objection.

104 S.Ct. at 2590. Significantly, the majority opinion in *Stotts* never cited *Weber.*

Unlike the plaintiffs in *Stotts,* frustrated applicants for hire to the Fire Department in this case are not deprived of any vested seniority rights. Moreover, the plan in this case has been voluntarily adopted by the City, and is not a court-ordered plan imposed over its objection. Thus, *Stotts* clearly is distinguishable.

The United States, however, urges that *Stotts* precludes the use of any race-conscious affirmative action plan. The Court disagrees. As the Sixth Circuit Court of Appeals has stated:

---

**6.** The record reveals that 98.4% of the 1980 test-takers passed, and that 85.1% of the 1984 test-takers passed.

**7.** See footnote 5.

*Weber* precludes any notion that title VII absolutely forbids voluntary action by an employer to the detriment of the seniority rights of non-minority workers. To read *Stotts* as invalidating the present plan as impermissible under title VII is to conclude that *Stotts sub silentio* overruled *Weber.* We believe that the Court would have expressly addressed *Weber* had it intended to overrule that decision. *Vanguards,* 753 F.2d at 487–88. *Accord, Van Aken v. Young,* 750 F.2d 43, 45 (6th Cir.1984); *Wygant v. Jackson Board of Education,* 746 F.2d 1152, 1157–58 (6th Cir.1984).

In addition to the Sixth Circuit cases just cited, several other Circuits, after *Stotts,* have approved race-conscious affirmative action plans. *EEOC v. Local 638,* 753 F.2d 1172, 1186–1187, 36 Fair Empl. Cas. 1466, 1477–78 (2d Cir.1985); *Johnson,* 748 F.2d at 1308 (9th Cir.1984); *Kromnick v. School District of Philadelphia,* 739 F.2d 894 (3d Cir.1984); *Bushey,* 733 F.2d at 227–28 (2d Cir.1984); *In re Birmingham Reverse Discrimination Employment Litigation,* 37 Fair Empl.Prac.Cas. 1, 8 (N.D.Ala.1985); *Deveraux v. Geary,* 596 F.Supp. 1481, 1486–87 (D.Mass.1984).

While the Court is not necessarily prepared to go as far as each of these cases in terms of providing race-conscious affirmative relief, these cases clearly demonstrate that, contrary to the contention of the United States, such relief is not prohibited. These cases also establish that the specific hiring portions of the Fire Department's plan are permissible under Title VII.

### B. Constitutional Analysis.

■ In addition to satisfying Title VII criteria, the Fire Department's AAP must survive constitutional analysis. The United States asserts that the plan violates the Equal Protection component of the Due Process Clause of the Fifth Amendment. *See Washington v. Davis,* 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976); *Bolling v. Sharpe,* 347 U.S. 497, 498–99, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954) (applying Fifth Amendment Due Process principles to the District of Columbia). Equal protection analysis under the Due Process Clause of the Fifth Amendment is the same as that under the Fourteenth Amendment. *Buckley v. Valeo,* 424 U.S. 1, 93, 96 S.Ct. 612, 670, 46 L.Ed.2d 659 (1976).

In *Regents of the University of California v. Bakke,* 438 U.S. 265, 305, 98 S.Ct. 2733, 2756, 57 L.Ed.2d 750 (1978) (opinion of Powell, J.), the Supreme Court stated that an affirmative action plan containing classifications based on race must be regarded as suspect. A government can employ race-based classifications only when they serve a compelling governmental interest. *Id.* at 298, 98 S.Ct. at 2752. One such compelling interest is the "interest in ameliorating, or eliminating where feasible, the disabling effects of identified discrimination." *Id.* at 307, 98 S.Ct. at 2757. *Accord, Kromnick,* 739 F.2d at 900–909. The discrimination may be identified by:

judicial, legislative, or administrative findings of constitutional or statutory violations. [citations omitted] After such findings have been made, the governmental interest in preferring members of the injured groups at the expense of others is substantial, since the legal rights of the victims must be vindicated. In such a case, the extent of the injury and the consequent remedy will have been judicially, legislatively, or administratively defined.

*Id.* 438 U.S. at 307–08, 98 S.Ct. at 2757.

The hiring provisions of the Department's AAP meet this standard. In this case there has been an administrative (OHR) finding that the entry level test adversely affected black applicants. This finding is fully supported by statistical evidence as well. Under *Bakke,* 438 U.S. at 307–08, 98 S.Ct. at 2757, this is a sufficient predicate for the implementation of race-conscious affirmative relief.

*Bakke* also teaches, however, that the remedial steps should "work the least harm possible to other innocent persons competing for the benefit." *Id.* at 308, 98 S.Ct. at 2757. *See Also, Thompson v. Sawyer,* 678

F.2d at 294. Similarly, in *Fullilove v. Klutznick*, 448 U.S. 448, 480, 100 S.Ct. 2758, 2775, 65 L.Ed.2d 902 (1980) (opinion of Burger, C.J.), the Court stated that a race-conscious program designed to remedy "the present effects of past discrimination [must be] narrowly tailored to the achievement of that goal."

In *Fullilove*, the Supreme Court upheld a Congressional requirement that 10% of federal funds granted for local public works projects must, with certain exceptions, be used to procure servicesf or supplies from business owned by racially-identified minorities. Plaintiffs in that case had contended that the statute was unconstitutional because it would have the effect of awarding some contracts to minority firms which otherwise might be awarded to innocent non-minority firms. In rejecting that contention, Chief Justice Burger wrote as follows:

> It is not a constitutional defect in this program that it may disappoint the expectations of nonminority firms. When effectuating a limited and properly tailored remedy to cure the effects of prior discrimination, such a "sharing of the burden" by innocent parties is not impermissible.

*Id.* at 484, 100 S.Ct. at 2778 (citations omitted).

Thus, although a race-conscious affirmative action plan must be "narrowly tailored", it may still require innocent whites to "share the burden" of remedying past discrimination. Like the minority set-aside in *Fullilove*, the hiring provisions of the Fire Department's AAP ask white applicants to shoulder only a minor burden.

The hiring part of this plan, therefore, is sufficiently narrowly tailored, seeking only to correct the adverse impact of the entry-level test, and to remedy past discrimination. As previously noted, the white applicants have little expection of being hired merely because they passed the entry level test. The AAP does not "unnecessarily trammel" their interests, *Weber*, 443 U.S. at 208, 99 S.Ct. at 2730, merely because it asks them to "share the burden" of reme-

dying past discrimination. *Fullilove*, 438 U.S. at 484, 100 S.Ct. at 2778 (opinion of Burger, C.J.) *Accord, Vanguards*, 753 F.2d at 484.

In sum, the hiring provisions of the plan at issue pass both Title VII and constitutional muster. The Court must admit that it is not comfortable with racially based distinctions, and in this case perhaps a strength or agility test might be less objectionable. However, "no decision of [the Supreme] Court has ever adopted the proposition that the Constitution must be colorblind." *Bakke*, 438 U.S. at 336, 98 S.Ct. at 2771 (opinion of Brennan, J., joined by White, Marshall, and Blackmun, JJ.) The same can be said for Title VII. *Weber, supra.* Accordingly, because the hiring portions of this temporary plan are narrowly tailored to remedy a discriminatory test, the Court approves the hiring aspects of the plan.

## II. THE PROMOTIONAL ASPECTS OF THE AAP ARE IN VIOLATION OF TITLE VII. ALTHOUGH TEMPORARY AND JUSTIFIED BY A PRIOR FINDING OF PAST DISCRIMINATION, THEY UNNECESSARILY TRAMMEL THE RIGHTS AND INTERESTS OF NONMINORITY FIRE-FIGHTERS.

The promotional aspects of the plan must be put through the same analysis utilized above for the plan's hiring provisions. The standard set forth by the Supreme Court in *Weber, supra* applies to the plan as a whole, and, thus, to the promotional aspects of the plan. Applying this standard, it is clear to the Court that this area of the plan is deficient under Title VII, and must be struck down.

Initially, it is undisputed that the plan sets forth "short-range goals," which are race-conscious in nature. Under the *Weber* analysis, these race-conscious goals may only be approved by this Court unless they meet three tests: (1) they are "specifically designed to break down patterns of racial discrimination;" (2) they do not "unnecessarily trammel" the rights of whites; and

(3) they are temporary. *Weber, supra* 443 U.S. at 208, 99 S.Ct. at 2730.

■ A careful analysis of the promotional aspects of the plan here at issue results in the inescapable conclusion that only the first and third prongs of the *Weber* test have been met. As discussed more fully above, the plan is indeed temporary. It is also based on clear statistical evidence of a pattern of discrimination in the supervisory ranks of the Department. However, the Court finds that the AAP "unnecessarily trammels" upon the rights and interests of the white firefighters, who are in line for promotions, by advancing blacks based solely on their race over more qualified and more senior white firefighters.

■ Before the plan can legitimately utilize race-conscious goals which infringe on the interests of non-minority employees, there must be a showing that the plan is specifically tailored to remedy discrimination. *Weber, supra* at 208, 99 S.Ct. at 2729. This can be done utilizing either statistical evidence or official findings of past patterns of discrimination. Unlike the entry-level examinations and the entire hiring process in the District's Fire Department, there has never been an administrative, legislative or judicial finding of discrimination in the promotion process. *University of California Board of Regents v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). While the *Bakke* case was primarily concerned with the Constitutional aspects of equal employment opportunity, the Court finds it particularly applicable to the present analysis. The *Weber* Court also was concerned with limiting race-conscious remedies to correct discriminatory practices. It can be said that the Supreme Court in *Weber* borrowed from the constitutional analysis in this field requiring a compelling state interest and a remedy narrowly designed to serve that interest. *Weber* incorporated this into a Title VII analysis, requiring a finding of a pattern of racial discriminations—the compelling state interest—and a remedy which is narrowly tailored to remedy that pattern of discrimination. Other Circuits have rec-

ognized this merging of Constitutional and Title VII considerations. *See, Janowiak v. City of South Bend,* 750 F.2d 557, 561 (7th Cir.1984). The teaching of these cases taken together is that before an employer, public or private, can utilize race-conscious quotas, there must be a prior determination of discrimination in the area the remedy is designed to effect. This determination can be made based on either statistical evidence or an official finding. *Bushey v. New York State Civil Service Commission,* 733 F.2d 220 (2d Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 803, 83 L.Ed.2d 795 (1985); *Vanguards v. City of Cleveland,* 753 F.2d 479 (6th Cir.1985); *Van Aken v. Young,* 750 F.2d 43 (6th Cir.1984): *EEOC v. Local 638,* 753 F.2d 1172, 36 Fair Empl. Prac. Case 1466 (2d Cir.1985).

Here, it cannot be said that any official determination of past discrimination was ever made in regards to the promotion system of the District's Fire Department. On the contrary, the OHR Hearing Officer made the clear finding, adopted by the Appellate Officer and OHR, that the promotion process is in fact valid and job-related. The city, however, argues that it has a legitimate basis for the plan, in the form of statistical evidence showing disparity between whites and minorities at every level of the Fire Department. *Bushey v. New York, supra* at 228. The Court agrees the statistical evidence of discrimination in the supervisory ranks is undeniable. Minority representation in three ranks at issue here are as follows: Sergeant—31.6%; Lieutenant—29.2%; Captain—15.6%. There is no question but that these statistics alone are enough to make out a prima facie case of· discrimination in the supervisory ranks. *Bushey, supra.*

The plan provides for the advancement of black firefighters over white firefighters based solely on race rather than on merit. The city disputes this conclusion, saying that the plan does not require mandatory promotion of specified numbers of blacks, only that the short-range goals be considered when promotions to the supervisory ranks are made. However, it is clear to the

Court that the short-range race-conscious goals are to be the overriding factor in making promotion decisions between now and October, 1986, when the plan is to expire.

■ The process envisioned by the plan would require the use of the "Rule of Nine Plus." The Court will not say the Rule is unlawful per se. However, the effect of the Rule of Nine Plus would be to allow the Fire Chief and the Promotion Board to consider a range of candidates including, in all probability, a higher number of minority candidates, when making promotion decisions. If the plan had a formula whereby the final decision on whom to promote would be based on the individual qualifications and merits of the candidates then it would be more easily acceptable as race would not be the deciding factor, and as such this would be permissible under Title VII. However, the plan goes much further. By requiring the Fire Chief and the Promotion Board to justify their decisions in light of the potential impact on the numerical race-conscious short-term goals, the plan is in reality making these goals mandatory, and the overriding factor in promotions. Thus, race becomes the key to admission into the upper echelons of the District of Columbia Fire Department.

While *Weber* did provide for some degree of permissible "trammeling" on the interests of white employees, this plan goes much further than did the plan in *Weber.* That case involved a "quota" for placement of minority workers into a new in-plant craft training program. *Id.* 443 U.S. at 199, 99 S.Ct. at 2725. Because no such program had previously existed, the "quota" did not deprive whites of rights they had previously enjoyed, or of legitimate expectations they had earned. *Here, however, the plan seeks to deprive the white firefighters of a legitimate and long-standing expectation of an equal opportunity to advance into the supervisory ranks, an opportunity they have earned by serving the requisite minimum of five years in the department and scoring well on the promotional examination. The white firefighters have earned the right to expect to be able to reap the rewards of their many years of service and dedication, without having those rewards stripped away solely on the basis of race. Black firefighters have also worked hard, having to overcome a long history of racial prejudice. However, the fact of past discrimination alone is not enough to deprive innocent whites of their legitimate expectation of advancement. Any employee, in the public or private sector, who works hard and fulfills the requirements of his employment, has a legitimate expectation that he or she will be given a fair and equal opportunity to advance, based on merit and achievement. This is not something which can be taken away from him or her just because he or she happens to be of a particular race. As shown above, the plan makes race a mandatory consideration over merit, and thus unnecessarily trammels the interests of white firefighters. Id. at 203, 99 S.Ct. at 2727.*

It is the failure of the plan to meet this aspect of the *Weber* analysis which causes the promotional aspects of the plan to fail, and ultimately brings the entire AAP down. The rights and interests of all firefighters should be equally balanced. There cannot be a mandatory policy of promotions based solely on race which deprives other equally qualified candidates of their hard-earned right to be given a fair opportunity to be considered for advancement. While some displacement of whites is tolerable under *Weber,* there must be some viable alternative to the process envisioned in this plan. *Thompson v. Sawyer, supra.* An alternative which would give all firefighters, regardless of race, gender and national origin, the same opportunity to be evaluated on their merits and ability, not on the color of their skin, sex or national origin.

As a result of the Court's holding that the promotional aspects of this plan violate Title VII, and the Court's ultimate disapproval of the entire plan based on this holding, the five promotions made on

March 8, 1985 are hereby declared void. No promotions may be made on the basis of this plan, until the serious defects it contains are corrected.

## CONCLUSION

█ The Court holds here today that the hiring aspects of the AAP are minimally acceptable under Title VII and the Constitution. The Court does suggest that, upon remand, the city consider whether there exist any viable alternatives to the procedures set forth in the plan. The Court further holds that the promotion aspects of the plan are in clear violation of Title VII, as that portion of the plan unnecessarily trammels on the rights and interests of white firefighters. As such, the promotion aspects must be struck down.

The Court emphasizes that, although it allows one part of this plan and disallows another, it applies the same standard to both. This holding, therefore, is consistent with the current state of the law that has evolved in the equal employment area. As a consequence of one portion of the plan failing to meet the Title VII standards set forth above, the Court, by Order of even date herewith, must disapprove the entire proposed plan and remand it back to the city for further consideration in light if this opinion. The Court stresses, however, that it is not ordering any specific action in regards to what the plan must contain to be acceptable. The Court is merely offering its advice and guidance which the city may, or may not, follow in re-formulating the plan. However, the plan which is to be re-submitted to this Court should be drawn after a thorough investigation into viable alternatives to race-conscious numerical goals or quotas. *Segar v. Smith*, 738 F.2d 1249 (D.C.Cir.1984); *Thompson v. Sawyer*, 678 F.2d 257 (D.C.Cir.1982). However, and most importantly, the plan must conform to Title VII and the Constitution of the United States.

## ORDER

In accordance with the Opinion of even date herewith, it is, by the Court, this first day of April, 1985

ORDERED that the *Hammon* plaintiffs' motion for summary judgment be, and the same is, hereby granted in part, in that the Court has reluctantly approved the hiring aspects of the AAP. In all other respects, their motion for summary judgment is hereby denied; and it is

FURTHER ORDERED that the *Byrne* plaintiffs' motion for summary judgment be, and the same is, hereby granted with respect to the promotion aspects of the plan only, which have been declared unlawful. In all other respects, their motion for summary judgment is hereby denied; and it is

FURTHER ORDERED that the United States' motion for summary judgment be, and the same is, hereby granted in part, insofar as the promotion aspects of the plan are declared unlawful. In all other respects, the motion for summary judgment is hereby denied; and it is

FURTHER ORDERED that the District of Columbia and co-defendants' motion for summary judgment be, and the same is, hereby denied, in that since a portion of the plan is invalid, the entire plan is invalid; and it is

FURTHER ORDERED that the promotion of five black firefighters to the rank of Sergeant, made on March 8, 1985 retroactive to October 20, 1984, are hereby declared void; and it is

FURTHER ORDERED that the AAP presented to the Court by the District pursuant to paragraph 5 of the Consent Decree of May 23, 1985, be, and the same is, hereby remanded to the District of Columbia for reconsideration in light of this Opinion, and shall be resubmitted to the Court in no more than 45 days from the date hereof, and the Court emphasizes that such plan, when presented to the Court, shall discuss the alternatives to any race-based or race-conscious process, and otherwise comply with the Civil Rights Act of 1964, as amended, and the United States Constitution.