826 F.2d 73
 44 Fair Empl.Prac.Cas. 869,
44 Empl. Prac. Dec. P 37,323, 264 U.S.App.D.C. 1,
56 USLW 2106
 Marvin K. HAMMON, et al. United States of America, Appellant,
v.
Marion S. BARRY, Jr., Mayor, D.C., et al. (Two Cases).
Kevin Michael BYRNE, et al. United States of America, Appellant,
v.
Theodore R. COLEMAN, D.C. Fire Chief, et al.
 Nos. 85-5669, 85-5670, 85-5671.
 United States Court of Appeals,
 District of Columbia Circuit.
Argued May 22, 1987.
Decided Aug. 14, 1987.
 
 Appeals from the United States District Court for the District of Columbia (Civil Action Nos. 84-00903, 85-00782 and 85-00797).
 Charles L. Reischel, Deputy Corporation Counsel, DC, with whom John H. Suda, Acting Corporation Counsel, DC was on the petition for rehearing or rehearing en banc for appellee, District of Columbia.
 Joan Burt was on the petition for rehearing or rehearing en banc for appellees, Hammon, et al.
 William Bradford Reynolds, Assistant Attorney General, Department of Justice, with whom Michael A. Carvin, Deputy Assistant Attorney General, David K. Flynn and Robert Delahunty, Attorneys, Department of Justice were on the memorandum in opposition to petitions for rehearing or rehearing en banc for appellant, United States of America.
 Before MIKVA, STARR and SILBERMAN, Circuit Judges.
 
 
 1
 Opinion for the Court filed by Circuit Judge STARR.
 
 
 2
 Concurring statement filed by Circuit Judge SILBERMAN.
 
 
 3
 Dissenting opinion filed by Circuit Judge MIKVA.
 
 ON PETITION FOR REHEARING
 STARR, Circuit Judge:
 
 4
 This petition for rehearing raises the issue whether the panel's opinion in Hammon v. Barry, 813 F.2d 412 (D.C.Cir.1987), has been undermined by the Supreme Court's recent decision in Johnson v. Transportation Agency, Santa Clara County, California, --- U.S. ----, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987). After careful reflection, we conclude for the reasons that follow that Johnson does not alter the result in this case.
 
 
 5
 * In Hammon, the panel, over dissent, struck down the hiring provisions of the District of Columbia's affirmative action plan (AAP) as violative of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e et seq. (1982 & Supp III 1985). We concluded that a predicate of discrimination must exist before race-conscious measures may lawfully be employed in a hiring plan. Hammon, 813 F.2d at 420-25. We further concluded that, once the threshold requirement of discrimination is met, the remedy must be tailored to fit the violation. Id. at 425-26. After analyzing the record in this case, which was before the District Court on stipulated facts and adjudicated by that court on summary judgment, we determined that the necessary predicate had not been established. Id. at 426-28. In addition, we held that even if the predicate existed, the hiring scheme created by the plan was not tailored to cure the "violation" because potential alternatives to the race-conscious regime were not considered. Id. at 428-30.
 
 
 6
 Shortly after our opinion issued, the Supreme Court rendered its decision in Johnson. In that case, the Court upheld in the face of an attack under Title VII a county transportation agency's promotion of a female over a marginally better qualified male to a skilled position (a road dispatcher in the agency's Roads Division) pursuant to a voluntarily promulgated affirmative action plan. The plan at issue in that case authorized the agency to consider the sex of a qualified applicant as one factor in making promotions to positions within a traditionally segregated job classification in which women had been significantly underrepresented.
 
 
 7
 Invoking Johnson, the District of Columbia now maintains that our "basic premise"--that discrimination is a predicate to remediation--has been "demolished" by the Supreme Court in one fell swoop. District's Petition at 1-2. We disagree. In our view, Johnson does not sweep so broadly as to eviscerate the carefully crafted body of existing law under Title VII.
 
 
 8
 Guided by its decision in Steelworkers v. Weber, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), the Johnson Court held that for an affirmative action plan to withstand scrutiny under Title VII, consideration of the race or sex of applicants must be "justified by the existence of a 'manifest imbalance' that reflect[s] underrepresentation of women [or minorities] in 'traditionally segregated job categories.' " Johnson, 107 S.Ct. at 1452 (quoting Weber, 443 U.S. at 197, 99 S.Ct. at 2724). The Court explained:
 
 
 9
 The requirement that the "manifest imbalance" relate to a "traditionally segregated job category" provides assurance both that sex or race will be taken into account in a manner consistent with Title VII's purpose of eliminating the effects of employment discrimination, and that the interests of those employees not benefitting from the plan will not be unduly infringed.
 
 
 10
 Id.[1] See also Ledoux v. District of Columbia, 820 F.2d 1293 (D.C.Cir.1987).
 
 
 11
 The Court was thus clear in relating the existence of employment discrimination (and goal of eliminating its effects) to the bedrock Congressional purposes informing Title VII. Johnson went on to provide guidance to lower courts in this sensitive and delicate area on the fact-specific task of determining whether the requisite "manifest imbalance" exists. In jobs that require no special expertise, the Court stated, "a comparison of the percentage of minorities or women in the employer's work force with the percentage in the area labor market or general population is appropriate." Id. (citations omitted). For jobs that require special training, on the other hand, "the comparison should be with those in the labor force who possess the relevant qualifications." Id. (citation omitted).
 
 
 12
 Applying those standards to the facts before it, the Johnson Court concluded that the "manifest imbalance" predicate was clearly shown in the job classification at issue. Specifically, in the job category in question, women were "egregiously underrepresented"; indeed, "none of the 238 positions was occupied by a woman." Id. 107 S.Ct. at 1454 (emphasis in original).[2] As Justice O'Connor described it, "at the time the affirmative action plan was adopted, there were no women in the agency's skilled craft positions." Id. at 1465 (O'Connor, J. concurring) (emphasis in original). The inference of discrimination, as she graphically detailed the situation before the Court, arose from the "inexorable zero." Id.[3]
 
 II
 
 13
 * Before we embark on our analysis of Johnson 's effects, we pause to address a preliminary issue. Late in this process--indeed following oral argument on the rehearing petition--we directed the parties to brief the issue, raised by the court sua sponte, whether the United States has standing to challenge the constitutionality of the AAP's hiring provisions. In its response, the United States contends that Sec. 707 of Title VII, 42 U.S.C. Sec. 2000e-6, which authorizes the Attorney General to bring an action whenever he has "reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by [Title VII]," authorizes the Justice Department to raise ancillary constitutional claims under the Fifth and Fourteenth Amendments as well. In support of its position, the United States argues that it would be incongruous to permit the Attorney General to pursue statutory violations, but not constitutional violations, when the alleged offenses are based on the same set of facts and the statutory and constitutional jurisprudence in the area are closely interwoven.
 
 
 14
 In addition to this common-sense argument, the United States draws an analogy to a line of cases in which the Supreme Court has held that Sec. 1971(c) of the Voting Rights Act, 42 U.S.C. Sec. 1971(c) (1982) (authorizing the Attorney General to bring an action whenever he has "reasonable cause to believe that any person is about to engage in any act or practice which would deprive any other person of any right or privilege secured by subsection (a) or (b) of this section") empowers the Attorney General to bring suit to protect the voting rights of black citizens guaranteed by the statute (under subsection (a) or (b)) and by the Fourteenth and Fifteenth Amendments. Louisiana v. United States, 380 U.S. 145, 151, 85 S.Ct. 817, 821, 13 L.Ed.2d 709 (1965); United States v. Mississippi, 380 U.S. 128, 136-38, 85 S.Ct. 808, 812-13, 13 L.Ed.2d 717 (1965); United States v. Alabama, 362 U.S. 602, 80 S.Ct. 924, 4 L.Ed.2d 982 (1960).
 
 
 15
 The District of Columbia, on the other hand, argues that the United States lacks standing to enforce directly the rights secured to individuals by the Constitution. The District buttresses its argument with decisions of three circuits holding that, without explicit authorization by Congress, the United States may not bring suit on behalf of third parties to enjoin violations of the Constitution's substantive provisions. See United States v. City of Philadelphia, 644 F.2d 187 (3d Cir.1980), reh'g denied, 644 F.2d 207 (3d Cir.1981); United States v. Mattson, 600 F.2d 1295 (9th Cir.1979); United States v. Solomon, 563 F.2d 1121 (4th Cir.1977).
 
 
 16
 In light of (1) the manifest importance of this issue; (2) its novelty in this circuit; and (3) the venerable principle that courts should avoid " 'questions of a constitutional nature unless absolutely necessary to a decision of the case,' " Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (citation omitted), we decline, on reflection, to pass on the issue of the United States' standing. We are buoyed in that conclusion by the fact that the question has been raised so late in the litigation's cycle. As a result, we would be called upon either to wrestle with this troublesome issue without the benefit of full argument or to delay this litigation even further by setting the case down yet a third time for oral argument. By virtue of this act of self-restraint, a posture that well becomes the least dangerous branch of our government, there should be no doubt whatever that our decision in this case is grounded solely on the law of Title VII. With this in mind, we return after this detour to the primary question raised in the petition for rehearing: whether Johnson has undermined the majority opinion in Hammon.
 
 B
 
 17
 On its face, the present case stands in stark contrast to the situation in Johnson. Here, the District of Columbia Fire Department has been hiring blacks for entry-level positions at an average rate of almost 50 percent per year since 1969. By Title VII's hourglass, eighteen years is a long time. But the news of late is even cheerier from Johnson's perspective. Since 1981, an average of over 75 percent of those hired each year as entering firefighters have been black.[4] Not surprisingly, the result of these hiring patterns is light years away from the situation that prevailed in Johnson. Indeed, as of April 1984, 37 percent of the District's firefighting force was black.
 
 
 18
 The District Court nonetheless asserted, in conclusory fashion, that vestiges of discrimination remain in the Fire Department. In arriving at this determination, the trial court arguably made two "factual findings." First, the court "found" the undisputed fact that the Fire Department was officially segregated in the early 1950's. Hammon v. Barry, 606 F.Supp. 1082, 1086-87 (D.D.C.1985). See Hammon, 813 F.2d at 428 n. 32. The relevance of that "finding" to a modern-day hiring remedy is not at all clear.[5] But even accepting arguendo the relevance of the point, it should go without saying that we fully accept that which is undisputed and thus consider it a "given" that officially sanctioned discrimination prevailed in the Fire Department in the 1950's. The rather obvious and substantial temporal gap between the time of the Korean Conflict (at the conclusion of Harry Truman's Presidency and General Eisenhower's ascension to power) and the present day, however, suggests that something more recent should serve as a predicate for remedial action right now. However, notwithstanding the dissent's fervent assertion that insidious discriminatory practices at the Fire Department continued into the 1970's, see Dissent at 91, 92-93, the District Court made no findings to that effect. As the dissent takes pains to remind us time and again, fact-finding is the province of the trial court, and it is to that court that we explicitly allowed the parties to return for litigation of whether invidious discrimination infects the Fire Department. Hammon, 813 F.2d at 432 n. 37; see infra note 9. And thus we are brought, more relevantly, to the District Court's determination that "there still exist some vestiges of the aforementioned past discrimination." Hammon, 606 F.Supp. at 1087.
 
 
 19
 This latter "finding" was based expressly, and solely, on the "current statistics" in the Fire Department. Id. The District Court simply recited the racial composition in the Fire Department, without any sort of analysis of the raw percentages or explanation of how those percentages demonstrate vestiges of the generation-old violation. One is put in mind of the old saw as to the veracity, or lack thereof, of statistics. Indeed, the District Court's rather mechanical incantation of statistics--the bulk of which are relevant only to discrimination in promotions (an issue not before us)--does not withstand the least rigorous sort of analysis.
 
 
 20
 Under Johnson's teaching, the percentage of blacks in the District's Fire Department is to be compared with the percentage of blacks in the area labor force. There should be no mistaking the correct benchmark in this case: the relevant labor force consists of persons 20 to 28 years of age in the Washington metropolitan area, not just within the confines of the Nation's capital. The reason is that it is undisputed that approximately half of the District's entry-level firefighters have hailed from the suburbs. According to the 1980 Census, only 29.3 percent of the statistically relevant metropolitan area population is black. In view of the fact that the Fire Department work force has a greater percentage of blacks than the black percentage in the area labor force, the District Court's conclusion that vestiges of discrimination remain in the Fire Department is plainly in error.[6] See Fed.R.Civ.Pro. 52(a); cf. Turner v. Safley, --- U.S. ----, ---- - ---- n. *, 107 S.Ct. 2254, 2264-65, n. **, 96 L.Ed.2d 64 (1987); Pullman-Standard v. Swint, 456 U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982).
 
 
 21
 Indeed, even if we employ the applicant pool as a surrogate for the area labor force, as the District Court did, the District Court's "finding" nonetheless remains entirely without foundation. As we elaborated previously, see Hammon, 813 F.2d at 427-28, the average percentage of black hires each year since 1981 (over 75.5 percent) is greater than the percentage of blacks in either of the two applicant pools referred to by the District Court (74.53 percent in 1980 and 64.6 percent in 1984).[7]
 
 
 22
 As a result, only if the percentage of blacks in the Fire Department is compared to the percentage in the District of Columbia's population--without regard to the fact that approximately half of the new firefighters are hired from the suburbs--is there even arguably an "imbalance." However, as there is no suggestion that the District acted in a discriminatory fashion by hiring from the entire metropolitan area, we decline to engage in an entirely artificial comparison between the percentage of blacks in the District's Fire Department and its population.[8] See generally Hammon, 813 F.2d at 426-28 & 432 n. 1.
 
 
 23
 In sum, there is no manifest imbalance in the District's Fire Department; indeed, there is manifestly no imbalance at all. It could hardly be plainer that the District's Fire Department is not burdened with the clogged channels of opportunity that characterized the employment situation in Johnson (and in Weber ).[9]C
 
 
 24
 There is more. The operation of Santa Clara's affirmative action plan differed in a critical respect from that of the District. In Johnson, the Court repeatedly stressed that the plan set aside no specific number of positions for minorities or women; instead, the Santa Clara plan authorized consideration of ethnicity or sex as one factor for evaluating qualified candidates. Id. 107 S.Ct. at 1447 & 1454-57. Indeed, the plan at issue in that case expressly stated that " '[t]he "goals" established for each Division should not be construed as "quotas" that must be met.' " Id. at 1455 (quoting Appendix 64). The Court thus likened Santa Clara's plan to the "Harvard Plan," noted with approbation by Justice Powell in University of California Regents v. Bakke, 438 U.S. 265, 316-19, 98 S.Ct. 2733, 2761-63, 57 L.Ed.2d 750 (1978). As Justice Powell emphasized in Bakke, that plan allowed race to be deemed a "plus" in the college admissions process, but it emphatically did not insulate the individual from comparison with all other candidates. Id. Above all, the Harvard Plan did not embody a strict racial (or other) quota.
 
 
 25
 The District's plan, on the other hand, employs precisely that which neither Harvard nor Santa Clara County embraced--the tell-tale, single-factor, rigid quota. Under the District's approach, each entering class of firefighters must be composed of at least 60 percent blacks. Here, we have a hard-core, cold-on-the-docks quota, nothing less. This is certainly nothing remotely akin to either the Harvard Plan or the Santa Clara plan. Indeed, setting the passing score of its unvalidated entry-level test (administered in 1980 and 1984) at a very humble level, see Hammon, 813 F.2d at 429, and utilizing no other screening criteria (beyond a medical examination and background check), the District's hiring decisions are based almost entirely on a mandatory racial quota.[10] This regime stands in complete contrast to the plan at issue in Johnson, in which "supervisors were to consider a host of practical factors" in hiring decisions and where the hiring goal for women in the job category at issue was set at the modest level of approximately six percent for the plan's initial year. 107 S.Ct. at 1454.
 
 
 26
 Indeed, the District's plan flies in the teeth of Johnson's express caveat that "had the [agency's plan] simply calculated imbalances in all categories according to the proportion of women in the area labor pool, and then directed that hiring be governed solely by those figures, its validity fairly could be called into question." Id. In the absence of additional screening considerations, the District's plan dictates "mere blind hiring by the numbers."[11] It thus bears no resemblance to the "moderate, flexible, case-by-case approach" embodied in the plan at issue in Johnson. Id. at 1424, 1457.
 
 III
 
 27
 Quite apart from its very different facts, Johnson also squares with our analysis of the law of Title VII. Indeed, our earlier opinion was expressly informed by Weber, which broods omnipresently over the Court's decision in Johnson. See Hammon, 813 F.2d at 423-24; Johnson, 107 S.Ct. at 1449. Johnson fully shares with Weber, Bakke, and Fullilove v. Klutznick, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), what we described in our earlier opinion as "the salient characteristic of impaired access by certain (but by no means all) minorities to specific, identifiable educational, commercial, or job opportunities." Hammon, 813 F.2d at 423 (emphasis in original). See also supra note 9. In our view, this reality of impaired access (or predicate of discrimination) animated the Court's approval of the affirmative action drawn into question in those cases. The need to remedy discrimination figured prominently in Johnson, just as the "race-preference plan in Weber was 'remedial' in the broad sense of opening up to minorities theretofore closed channels of employment opportunities." Id. at 424-25. Indeed, the Court in Johnson emphasized that the Santa Clara plan "directed that sex or race be taken into account for the purpose of remedying underrepresentation." 107 S.Ct. at 1453 (emphasis added).
 
 
 28
 Therefore, while it provides further definition to the "predicate of discrimination" requirement, Johnson does not, as the District would have it, drastically alter the legal landscape so as to eliminate this long-standing requirement. Far from it, Johnson says not a word to suggest that it was working such a radical revolution in the law of Title VII. As co-laborers in the non-political branch, with its ancient culture of stability and predictability, we are loathe to assume that the Supreme Court was suddenly turning its back on all that it had said and done for so many years and in so many different cases, some of which were written in the rather fresh ink of the prior Term. Courts are reluctant, wisely so, to discern in Congressional activity an implied repeal of statutes, and we are similarly well-advised not to discover sub silentio overrulings in the more cloistered environs of the Article III branch, especially in matters of such moment to the law and to the Nation. Our institutional reluctance to swallow the District's "here today, gone tomorrow" reading of Johnson is reinforced by the clarity with which the Johnson Court indicated that it was not sanctioning an "anything goes" approach to race-conscious action; a manifest imbalance in a traditionally segregated job category, we are told repeatedly by the Court, is the condition precedent to this sort of race-conscious action. In short, it is our view that our earlier holding--that a predicate of discrimination is required before an employer may lawfully employ a race-conscious remedial device--is fully in keeping with Johnson 's clear holding that a "manifest imbalance" in a "traditionally segregated job category" must exist before an employer may engage in preferential hiring (or promotions).
 
 
 29
 Finally, Johnson does nothing to disturb the longstanding requirement that the remedy crafted to cure a violation be tailored to fit the violation.[12] Just last Term, the Court in Local 28, Sheet Metal Workers v. EEOC, --- U.S. ----, 106 S.Ct. 3019, 3050, 92 L.Ed.2d 344 (1986), reaffirmed the truism that the "tailoring" requirement fully obtains in the Title VII context. The Court in that case expressly warned that a lower court "should also take care to tailor its orders to fit the nature of the violation it seeks to correct." Id.
 
 
 30
 To be sure, the Johnson Court articulated the tailoring requirement in different terms than those employed in Sheet Metal Workers, but it also made quite clear that an affirmative action plan must not "unnecessarily trammel[ ] the rights of male [or nonminority] employees." 107 S.Ct. at 1455 (emphasis added). The Johnson Court drew this requirement directly from Weber, in which the affirmative action plan's validity rested on the fact that it did not "unnecessarily trammel the interests of the white employees" or "create an absolute bar to the advancement of white employees," and was "not intended to maintain a racial balance," but instead was a temporary measure designed to "eliminate a manifest racial imbalance." 443 U.S. at 208, 99 S.Ct. at 2730. This, it seems to us, spells out the very "tailoring" requirement embodied in a plethora of Title VII law that we elaborated in our earlier opinion. See Hammon, 813 F.2d at 425-26. That long-standing requirement, in our view, remains firmly entrenched in the law of Title VII.
 
 
 31
 We concluded previously that, because available race-neutral alternatives were not considered, the District's race-based hiring methods were not properly tailored to its remedial purposes. Hammon, 813 F.2d at 428-30. The District has come forward with no persuasive argument to the contrary. Its use of the AAP thus stands condemned under Title VII for this reason as well.
 
 
 32
 For the foregoing reasons, the petition for rehearing is
 
 
 33
 Denied.
 
 SILBERMAN, Circuit Judge, concurring:
 
 34
 I concur in Judge Starr's statement but write separately because I admit I am uncertain as to the meaning of "manifest imbalance," the imprecise term used by the Supreme Court interpreting Title VII of the Civil Rights Act in Johnson v. Transportation Agency, --- U.S. ----, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987).[1] Certainly we should ordinarily avoid constitutional issues if we can resolve a case on statutory grounds, but our first obligation as judges, I suppose, is to be as confident as we can that we are correct in our reasoning, and I believe the constitutional limits on the use of racial preferences by government employers are--in the aftermath of Johnson --more easily applied than is Title VII. Moreover, the dissent correctly observes that our initial opinion treated the constitutional and statutory cases interchangeably, see Hammon v. Barry, 813 F.2d 412, 420 (D.C.Cir.1987), and squarely relied on the Constitution to hold illegal the District's purpose (compliance with a D.C. proportional representation law) in adopting its affirmative action plan. See id., at 430-31. I think then, our proper course is to continue to rely, as I do, on both Title VII and the Constitution.
 
 I.
 
 35
 First, however, I need confront the issue that we raised sua sponte at oral argument on petitioner's request for rehearing and to which supplemental briefs were directed: Does the United States have standing to challenge the constitutionality of the District of Columbia's affirmative action plan?[2] The Attorney General's lawsuit alleged that the District of Columbia Fire Department's affirmative action plan (the "plan") violates both the substantive provisions of Title VII and, at the same time, violates the equal protection component of the due process clause of the Fifth Amendment. See Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). The government's theory--that the plan is designed to achieve an impermissible goal and excessively infringes upon the rights of innocent whites--arguably makes out both a Title VII violation and a constitutional violation. Indeed, when the Attorney General brought his suit, it might have been thought that Title VII and the Constitution imposed identical tests for evaluating the legality of race-conscious hiring plans; it was not until Johnson that this view was called into question.
 
 
 36
 As authority for this suit, the Attorney General relied on 42 U.S.C. Sec. 2000e-6 (1982), a section of the Civil Rights Act of 1964 ("1964 Act") granting the Attorney General authority to bring "pattern or practice" discrimination suits. Section 2000e-6 provides:
 
 
 37
 Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by [Title VII], and that the pattern or practice is of such a nature and is intended to deny the full exercise of the rights herein described, the Attorney General may bring a civil action ... requesting such relief ... as he deems necessary to insure the full enjoyment of the rights herein described.
 
 
 38
 42 U.S.C. Sec. 2000e-6(a) (1982) (emphasis added). The rights the Attorney General may "insure" by bringing suit include an individual's right to be free from discrimination by employers "because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. Sec. 2000e-2 (1982).
 
 
 39
 An early draft of the 1964 Act would have authorized the Attorney General to institute civil actions to redress the denial of any right, privilege, or immunity secured by the Constitution or laws of the United States. See H.R. REP. No. 914, 88th Cong., 1st Sess. 81 (1963); see also id. at 41 (additional views of Rep. Kastenmeier). But at a Judiciary Committee hearing in 1963, Attorney General Robert Kennedy testified against this broad grant of litigating authority:
 
 
 40
 [The proposal] would extend to claimed violations of constitutional rights in State criminal proceedings or in book or movie censorship; disputes involving church-state relations; economic questions such as allegedly confiscatory ratemaking or the constitutional requirement of just compensation in land acquisition cases; the propriety of incarceration in a mental hospital; searches and seizures; and controversies involving freedom of worship, or speech, or of the press.
 
 
 41
 Obviously, the proposal injects Federal executive authority into some areas which are not its legitimate concern....
 
 
 42
 Id. at 82 (Minority Report). In an effort to narrow the Attorney General's litigating authority to those matters specifically addressed by the 1964 Act, this expansive proposal was dropped from the bill. The Attorney General was instead given a more limited authority; specific sections of the Act now permit him to bring suits to protect only those rights specifically guaranteed by the Act. One of these provisions, section 2000e-6, allows the Attorney General to bring suit to protect those employment rights ensured by Title VII.
 
 
 43
 The question, then, is whether this authority permits the Attorney General to challenge a discrete employment practice of the District of Columbia on both Title VII and constitutional grounds. The answer turns on congressional intent--what kind of rights did Congress intend section 2000e-6 to protect? Between 1964 and 1972, the answer to this question was fairly clear. The 1964 version of Title VII "was enacted pursuant to the commerce power to regulate purely private decisionmaking and was not intended to incorporate and particularize the commands of the Fifth and Fourteenth Amendments." United Steel Workers of America v. Weber, 443 U.S. 193, 206 n. 6, 99 S.Ct. 2721, 2729 n. 6, 61 L.Ed.2d 480 (1979). But when Congress passed the Equal Employment Opportunity Act of 1972, Pub.L. No. 92-261 ("1972 Act"), it amended Title VII to protect, for the first time, employees of state and local governments. In so doing, Congress emphasized its intent to ensure to these employees their constitutional right to equal protection. The Senate, for its part, declared:
 
 
 44
 The Constitution is imperative in its prohibition of discrimination by State and local governments. The Fourteenth Amendment guarantees equal treatment of all citizens by States and their political subdivisions.... It is clear that the guarantee of equal protection must also extend to such direct action as discriminatory employment practices.
 
 
 45
 The Committee believes that it is an injustice to provide employees in the private sector with the assistance of an agency of the Federal Government in redressing their grievances while at the same time denying [similar assistance] to State and local government employees. The last sentence of the Fourteenth Amendment, enabling Congress to enforce the Amendment's guarantees by appropriate legislation is frequently overlooked, and the plain meaning of the Constitution allowed to lapse. The inclusion of State and local government employees within the jurisdiction of Title VII guarantees and protections will fulfill the Congressional duty to enact the "appropriate legislation" to insure that all citizens are treated equally in this country.
 
 
 46
 S. REP. NO. 415, 92d Cong., 1st Sess. 10-11 (1971) (emphasis added). The House of Representatives expressed the same view in similar language:
 
 
 47
 The expansion of Title VII coverage to State and local government employment is firmly embodied in the principles of the Constitution of the United States.
 
 
 48
 Legislation to implement this aspect of the Fourteenth Amendment is long overdue, and the committee believes that an appropriate remedy has been fashioned in the bill.
 
 
 49
 H.R. REP. NO. 238, 92d Cong., 1st Sess. 19 (1971) (emphasis added). Whatever the purpose of Title VII in 1964, the legislative history of the 1972 Act makes plain that Congress intended Title VII as a vehicle to attack employment discrimination allegedly violating either Title VII alone or both Title VII and the Constitution. I think it follows that Congress intended the Attorney General to use his section 2000e-6 litigating authority to assert that the same governmental conduct arguably violating Title VII also violates the Constitution.
 
 
 50
 The Supreme Court had little difficulty recognizing the Attorney General's standing on three occasions in the early 1960s when he invoked statutory authority under the Civil Rights Act of 1957, 42 U.S.C. Sec. 1971(a) (1982), to support a suit challenging a state's voting practices as violating both section 1971(a) and the Constitution. Section 1971(a), like section 2000e-2 of Title VII, is broadly written, providing that "[a]ll citizens of the United States who are otherwise qualified by law to vote ... shall be entitled and allowed to vote ... without distinction of race, color, or previous condition of servitude." In United States v. Mississippi, 380 U.S. 128, 85 S.Ct. 808, 13 L.Ed.2d 717 (1965), the Attorney General challenged as discriminatory that state's voting practices under both section 1971(a) and the Fourteenth and Fifteenth Amendments and Article I of the United States Constitution. He rested his authority to bring these claims on section 1971(c) of the 1957 Act, which provides:
 
 
 51
 Whenever any person has engaged ... in any act or practice which would deprive any other person of any right or privilege secured by subsection (a) or (b) of this section, the Attorney General may institute ... in the name of the United States, a civil action....
 
 
 52
 42 U.S.C. Sec. 1971(c) (1982). Although, like section 2000e-6, this provision does not explicitly allow the Attorney General to employ a constitutional theory to challenge the practices forbidden by the statute, the Supreme Court held that section 1971(c) provides "express congressional authorization for the United States to file a suit precisely of this kind." 380 U.S. at 136, 85 S.Ct. at 812; accord Louisiana v. United States, 380 U.S. 145, 151, 85 S.Ct. 817, 821, 13 L.Ed.2d 709 (1965) (section 1971(c) allows the Attorney General to bring suit to protect the voting rights of blacks guaranteed by section 1971(a) and the Fourteenth and Fifteenth Amendments); United States v. Alabama, 362 U.S. 602, 604, 80 S.Ct. 924, 926 4 L.Ed.2d 982 (1960) (allowing suit under section 1971(c) for violation of section 1971(a) and Fifteenth Amendment).
 
 
 53
 The Supreme Court has recently warned us, to be sure, not to equate for all purposes the statutory prohibitions of Title VII with the constitutional prohibitions against racial discrimination. See Johnson, 107 S.Ct. at 1449-50 n. 6. Indeed, the Court suggested, as I discuss below, that Title VII may permit certain affirmative action practices that the Constitution forbids. Id. But although the standards for determining if an employment practice violates Title VII of the Constitution seem now to differ, nothing the Court has said suggests that the Attorney General's section 2000e-6 litigating authority may not be used to challenge an employment practice that arguably violates both standards.
 
 
 54
 Thus, although it is doubtful whether the Attorney General would have standing, absent statutory authority, to bring a naked constitutional action against the District of Columbia, see United States v. City of Philadelphia, 644 F.2d 187, 199-201 (3d Cir.1980), reh'g denied, 644 F.2d 206 (3d Cir.1981); United States v. Solomon, 563 F.2d 1121, 1126-29 (4th Cir.1977),[3] I think it clear the Attorney General's authority under section 2000e-6 to bring Title VII "pattern or practice" claims permits him to argue in the same suit that the District of Columbia's hiring practices also violate related constitutional provisions.
 
 II.
 
 55
 The constitutional issue--presented, in my view, quite starkly in this case--is whether the District of Columbia may insist on proportional representation of blacks in government employment without violating the equal protection component of the Fifth Amendment's due process clause.[4] The answer, if drawn from recent Supreme Court constitutional decisions, seems clearly "no." Race-conscious employment policies on the part of government are permissible to remedy discrimination, see United States v. Paradise, --- U.S. ----, 107 S.Ct. 1053, 1064, 94 L.Ed.2d 203 (1987) (Brennan, J.); Wygant v. Jackson Bd. of Educ., 476 U.S. 267, 106 S.Ct. 1842, 1847, 90 L.Ed.2d 260 (1986) (Powell, J.), or, at least, the existing direct effects of past discrimination. Cf. Fullilove v. Klutznick, 448 U.S. 448, 477-78, 100 S.Ct. 2758, 2774-75, 65 L.Ed.2d 902 (1980). But Judge Starr's opinion seems to me to demolish the notion that black firefighters in the District have faced discrimination for any period of time relevant to a present remedial policy. See supra at 76-77. Indeed, if anything, it might be said that it is white firefighters, rather than black, who have faced recent racial discrimination. See Bishopp v. District of Columbia, 788 F.2d 781, 786-89 (D.C.Cir.1986); Dougherty v. Barry, 607 F.Supp. 1271 (D.D.C.1983);[5] cf. Dougherty v. Barry, 604 F.Supp. 1424, 1428-30 (D.D.C.1985). In truth, the only evidence the District advances to support its claim that the District discriminates against blacks is a test which, if used as an applicant ra device, apparently has a disparate negative impact on blacks. Putting aside the point that the very test in question passed constitutional scrutiny in the Supreme Court, see Washington v. Davis, 426 U.S. 229, 245-46, 96 S.Ct. 2040, 2050-51, 48 L.Ed.2d 597 (1976),[6] the District does not so use its test. Rather, its only purpose today apparently is to provide the District with a legal justification for hiring in accordance with a quota. The Fire Department administers the exam, but since it believes that rank order hiring based on the exam's results would be discriminatory, it does not do so.[7] Instead it hires pursuant to a quota to "remedy" the discriminatory effect of that which, as best I can determine, it does not do. This seems to me quite artificial, if not Orwellian.
 
 
 56
 Nor can the District's affirmative action plan be constitutionally defended as seeking racial diversity among firefighters for its own sake. Although the Court has recognized a legitimate, compelling governmental concern in state universities' seeking racial diversity in their student bodies for educational purposes, see Regents of the University of California v. Bakke, 438 U.S. 265, 311-15, 98 S.Ct. 2733, 2759-61, 57 L.Ed.2d 750 (1978) (Powell, J.), it has never extended this approach beyond the academic setting. Pursuing racial balance or proportional representation simpliciter is not a permissible goal of racial classifications under the equal protection clause. See Wygant, 106 S.Ct. at 1847-48 (Powell, J.); Bakke, 438 U.S. at 307, 98 S.Ct. at 2757 (Powell, J.).
 
 
 57
 The question remaining, as I perceive it, is whether the Supreme Court's reasoning in Johnson undermines its previous interpretations of the equal protection clause. How, it might be asked, does one square the Johnson Court's approval of a government affirmative action plan and corollary employment practices designed to alter a "manifest imbalance" of women in certain job categories with the Court's prior constitutional precedent authorizing racial or sexual preferences only to remedy discrimination? Does the Supreme Court's opinion, although ostensibly limited to an interpretation of Title VII, necessarily suggest a change in the Court's interpretation of the equal protection clause? To be sure, as Judge Starr's opinion rightly notes, there is a world of practical difference between the very low number of women in the relevant jobs in Johnson and, for example, the number of blacks in the D.C. Fire Department. But unless one accepts Justice O'Connor's reasoning--which the Court did not--that the small number of women in the particular job categories in Santa Clara County was itself evidence of employer discrimination, see Johnson, 107 S.Ct. at 1465 (O'Connor, J., concurring in the judgment), there is an undeniable tension between Johnson's rationale and prior constitutional analysis. That is so because it is difficult to reconcile the Court's prior prohibition in Wygant against government employers' seeking racial balance with the Court's approval in Weber and Johnson of governmental efforts to alter a manifest racial (or gender) imbalance. Judge Mikva, whose opinion, perforce, determines that the District's plan passes both statutory and constitutional muster, apparently sees no tension between the two lines of cases.[8] He seems to conclude that having thirty-seven percent blacks in the Fire Department as compared to seventy percent in the D.C. workforce "clearly" constitutes a manifest imbalance. But since he does not suggest at what level a "manifest imbalance" becomes merely an "imbalance," he does not appear to give any quantitative meaning to the word "manifest."[9] So I take Judge Mikva to believe that, in effect, the Supreme Court's Johnson opinion did exactly that which the Court denied doing--overruled its prior constitutional ban on racial balancing for its own sake.
 
 
 58
 I think it did not. That the Court in Johnson so carefully limited its opinion to an interpretation of Title VII, see Johnson, 107 S.Ct. at 1446 n. 2, suggests to me that the majority was unwilling to disturb its recently expressed equal protection limitations on racial or gender preferences for government employment--in particular its disapproval of proportional representation as a governmental goal. Justice Stevens quite clearly would proceed separately from the rest of the Court. By quoting at length in his concurring opinion from an article that justifies seeking racial diversity in employment based on a broad range of grounds, Justice Stevens seems to have abandoned constitutional objections to racial proportional representation. See Johnson, 107 S.Ct. at 1460 (Stevens, J., concurring). The majority of the Court, however--indeed by vivid contrast with Justice Stevens' opinion--has not accepted that position. Although I readily concede that interpreting Title VII to permit personnel practices that the Constitution prohibits seems anomalous, the Court has nevertheless concluded that Congress intended just that state of affairs. See Johnson, 107 S.Ct. at 1449-50 n. 6.
 
 
 59
 It is certainly true that granting hiring preferences to blacks or other minorities as a technique to foster employment integration--as opposed to merely remedying discrimination--has been employed by policymakers in federal and state governments in recent decades. The Court's Johnson opinion determines only that Congress, when it extended Title VII to public employers in 1972, did not mean to preclude totally this practice for government any more than it meant to do so in 1964 with respect to private employers. See Weber, 443 U.S. at 202-08, 99 S.Ct. at 2726-29. "Manifest imbalance," as used by the Supreme Court, is thus a synonym for segregation--whether intentionally maintained or not. So viewed, it is possible to categorize the female employees in the Johnson case as found in segregated jobs. The Court emphasized that women working for the Santa Clara County Transportation Agency were concentrated largely in EEOC job categories traditionally held by women. See Johnson, 107 S.Ct. at 1446. I therefore interpret Johnson and Weber as holding that Title VII permits temporary race-conscious employment practices by public or private employers to combat job segregation--and in that respect it seems incongruous to me to describe the District's Fire Department as segregated. But, in any event, it is one thing to interpret Title VII broadly to permit private and public employers' efforts to integrate their workforce or job classifications. It is another thing entirely to read the Constitution's equal protection provisions in such a fashion. Congress can, of course, control by further legislation how much and for how long racial preferences will be permitted, but the Constitution's equal protection clauses are not so flexible. The federal judiciary cannot, as if we were policymakers in the executive branch, interpret the Constitution so as to calibrate the granting of racial preferences until we conclude that a desirable degree of employment integration has been achieved. The Constitution is not an executive order.
 
 
 60
 The dissent seems to assume that the Constitution (as well as Title VII) permits local, state, and federal governments to provide employment preferences to blacks, and perhaps other minorities, until proportional representation is reached--presumably in all job categories. That cannot be so. It is manifestly inappropriate for us to take judicial notice of the unlikely proposition that all ethnic or racial groups in our society have the same relative interests in or capability for performing the various jobs in our economy. Cf. Local 28, Sheet Metal Workers, Int'l Ass'n v. EEOC, --- U.S. ----, 106 S.Ct. 3019, 3060, 92 L.Ed.2d 344 (1986) (O'Connor, J., concurring in part and dissenting in part). But see Hammon, 813 F.2d at 442 (Mikva, J., dissenting).[10] Furthermore, the dissent's position would make the legality--and even the constitutionality--of the District's plan turn on whether it was designed to obtain or maintain racial balance. That distinction, it seems to me, cannot hold. It is bizarre to suggest that the District legitimately could provide preferences for blacks until the Fire Department mirrors exactly, or to some arbitrary point short of exactly, the proportion of blacks in whatever is the relevant population, but thereafter no preference would be permitted even if the preference were necessary to maintain that proportion. In any case, the District's objectives are not so transitory; the city ordinance pursuant to which the affirmative action plan is adopted, although phrased in terms of a "goal," appears to call for permanent proportional representation. See D.C. Law 1-63, D.C. Code Secs. 1-507 to 1-514 (1981).
 
 
 61
 The dissent further argues strenuously that, if on no other grounds, the many years of the District's (as well as the country's) application of a "separate but equal" discriminatory policy justifies the District's affirmative action plan. See at 92-93 (Mikva, J., dissenting); Hammon, 813 F.2d at 435-36, 446-47 (Mikva, J., dissenting). That sounds like a general theory of reparations. As Justice Powell has cautioned, however, racial preferences for blacks cannot constitutionally be predicated on the general societal discrimination that blacks suffered for much of the nation's history. See, e.g., Wygant, 106 S.Ct. at 1847-48; Bakke, 438 U.S. at 307, 98 S.Ct. at 2757. If they were to be, that rationale would lead ineluctably to approval of proportional representation. Ironically, the District's policy can itself be described as embracing the notion of separate but equal--separate treatment of different races to achieve equal (proportionate) results. In the infamous case of Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896), Justice Harlan exposed the majority's claim that separate but equal was not a "badge of inferiority," see 163 U.S. at 551, 16 S.Ct. at 1143, by asserting that the separate accommodation laws at issue in that case were predicated on a governmentally sanctioned belief in white superiority. Id. at 560, 16 S.Ct. at 1147 (Harlan, J., dissenting). The District, of course, wishes to help its black citizens--not to degrade them with a badge of inferiority. But does not its hiring plan--which does not really attack discrimination or barriers to equal opportunity--suggest the very evil that infected the Plessy doctrine? And might it ultimately be even more harmful as an affront to black self-esteem because it was done with their interests paramount?[11]
 
 
 62
 I think this case has very little, if anything, to do with remedies for past discrimination--whether general or proximate, recent or long ago. Instead, it has a great deal to do with old-fashioned American politics, which has always had a strong ethnic flavor. As is well known, government employment in American cities was, for many years, parceled out to various ethnic groups in accordance with their political clout. Blacks, as the political majority in the District, are understandably claiming that which their predecessor groups in American cities once enjoyed. However, those very constitutional protections that may frustrate the political majority in the District also serve to protect nationwide minorities.
 
 MIKVA, Circuit Judge, dissenting:
 
 63
 I would grant the petition for rehearing; the original decision of the majority was wrong, and the majority's instant defense of it is more so. The Supreme Court's recent decision in Johnson v. Transportation Agency, Santa Clara County, California, --- U.S. ----, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987), has ravaged the majority's original opinion beyond repair.
 
 
 64
 The Johnson Court's endorsement of the voluntary affirmative action plan of a public employer vindicates my earlier conviction that the District of Columbia's affirmative action hiring plan for its Fire Department (the Plan) does not violate Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000-e et seq. (1982 & Supp. III 1985). Building upon the analytical framework introduced in United Steelworkers v. Weber, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), the Johnson Court established a two-part inquiry which a court must make in determining whether a challenger has sustained his burden in proving that a voluntarily adopted affirmative action plan violates Title VII. See Ledoux v. District of Columbia, 820 F.2d 1293, 1302-03 (D.C.Cir.1987). As I indicated in my original dissent in this case, the United States did not even begin to demonstrate the Plan's illegality under this test. See Hammon v. Barry, 813 F.2d 412, 433-47 (D.C.Cir.1987). I write here, therefore, not to elaborate on my reasons for concluding that the Plan withstands Title VII (as well as constitutional) scrutiny. I write instead to spotlight the disturbing gerrymandering of the facts and distortion of the law in which the majority engages in order to appear to survive Johnson 's devastating blow. I pause first, however, to underline the substantial retrenching the majority has done since the panel opinion.
 
 
 65
 A. Constitutional Aspects of the Original Majority Opinion
 
 
 66
 Rattled by the realization of the United States' dubious authority to pursue its constitutional challenge to the Plan, and wisely hesitant to enter that legal thicket, the majority recants any notion that its prior opinion was constitutionally-based. See Majority Opinion (Maj.Op.) at 76. This forswearing should not go unnoted. In employing constitutional principles to inform its prior Title VII analysis, the majority strongly suggested that the Plan violates the equal protection component of the Due Process Clause. In fact, the United States has argued that there is no need to rehear this case because whether or not the Plan can survive Title VII scrutiny after Johnson, it is still invalid for the constitutional reasons which this court delineated in its original opinion. Regardless of whether the majority meant to do so earlier, the court is now explicitly not holding the Plan unconstitutional.
 
 
 67
 It must be remembered that the majority did not confine its prior decision to the Plan before the court; the majority also heaped aspersions on the Affirmative Action in District Government Employment Act (D.C. Law 1-63), finally concluding that the law's admitted goal of attaining a racially balanced workforce is "constitutionally invalid." Hammon, 813 F.2d at 431. While the majority clearly still stands ready to use the law's aspirations to impugn (unfairly) the District's motives in adopting the Plan, see Maj. Op. at 79 n. 11, we must assume that the court has now retracted its earlier conclusion that D.C. Law 1-63 is constitutionally unsound.
 
 
 68
 Of course, once the constitutional underpinnings are removed and Johnson confutes the Title VII analysis, the question remains whether there is anything left to salvage of the majority's original reasoning. In my view, the majority has inherited the wind.
 
 B. Title VII Analysis Under Johnson
 
 69
 In its earlier decision, the majority also concluded that the statutory goal of a racially balanced workforce, as a ground upon which to support an affirmative action plan, "stands condemned by Title VII." Hammon, 813 F.2d at 431. The majority's pronouncement itself stands condemned by Johnson. The affirmative action plan upheld by the Court in Johnson was based explicitly on "the long-term goal of a workforce that mirrored in its major job classifications the percentage of women in the area labor market." Johnson, 107 S.Ct. at 1453-54. The Court endorsed the public employer's use of this aspiration as a "benchmark for measuring progress in eliminating underrepresentation" in its workforce. Id. at 1453. Thus, long-term goals of attaining racial parity with the "area labor market or general population," id. at 1452, such as is expressed in D.C. Law 1-63, serve as valid support for affirmative action plans.
 
 
 70
 The majority's insupportable assertion that D.C. Law 1-63 was "not merely aspirational, but to the contrary served as a guide for actual hiring decisions," Maj. Op. at 80 n. 11, highlights the majority's continued misrepresentation of the Plan. The majority steadfastly maintains the misconceived notion that the District designed the Plan's racial "quota" to reflect the racial composition of the District's workforce. The statistics themselves refute this contention: the percentage utilized by the Plan (60% black) does not "mirror[ ] almost exactly the percentage of blacks in the 'workforce' defined by D.C. Law 1-63." Id. The Plan governs the Fire Department's hiring in 1984 and subsequent years (until the list of eligible applicants from the administration of the 1984 test is exhausted). The percentage of blacks in the D.C. workforce in 1984 was 70%. (The majority inexplicably looks to the 1980 Census figures.) Had the District wanted to establish racial parity with the District's workforce, it would have used this 70% figure in the Plan. The Plan's actual figure--60%--does not imitate the percentage of blacks in the D.C. workforce; it matches the percentage of blacks who passed the 1984 entry level exam. The Plan does not blindly direct the Fire Department to hire six blacks for every four nonminorities hired from now until perpetuity, as one might understand from reading the majority's opinion. See, e.g., Maj. Op. at 79. The Plan addresses only the Department's selection of firefighters from among those applicants who passed the 198 eam. The Plan states simply that the racial composition of each entering class hired from the 1984 test must reflect the racial makeup of the qualified applicants for the job, and since the District knew the exact number of qualified black applicants (the 1984 exam having been administered almost one year before the Plan's submittal to the district court), the Plan states the relevant figure--60%. Thus, while the Plan was intended to achieve compliance with D.C. Law 1-63 and to further statutory objectives, contrary to the majority's understanding, this intention does not condemn the Plan under Title VII. See Maj. Op. at 79 n. 11. Attaining racial parity with the D.C. workforce remains the Department's long-term goal, but it is just that--a long-term goal. Like the long-term goal of the affirmative action plan endorsed by the Supreme Court in Johnson, it is "merely a statement of aspiration wholly without operational significance." Johnson, 107 S.Ct. at 1464 (O'Connor, J., concurring). The Plan's short-term goal, which is what we are reviewing in the instant case, is, like the plan at issue in Johnson, substantially more modest.
 
 
 71
 In attempting further to distinguish this case from Johnson, the majority distorts not only the facts of this case but also the law as enunciated by the Supreme Court. The majority implies that unless an affirmative action plan uses race only as one of numerous factors when evaluating qualified candidates--as a "plus" factor--the plan offends Title VII. See Maj.Op. at 79. Of course, this is clearly not true; contrary to the majority's intimations, Title VII does not forbid "quota" plans. In Weber, the seminal Title VII affirmative action case which informed and guided the Court's decision in Johnson, the Court sustained a quota plan. See Weber, supra (upholding plan requiring that blacks constitute 50% of new trainees). Indeed, the quota plan at issue in Weber established a minority set aside which far exceeded the percentage of blacks in the local labor force (39%). See Weber, 443 U.S. at 208, 99 S.Ct. at 2729-30. Not only did the Johnson Court not outlaw quota plans, but it explained that use of a quota system would only affect whether the plan needed an explicit end date. See Johnson, 107 S.Ct. at 1456 ("Express assurance that a program is only temporary may be necessary if the program actually sets aside positions according to specific numbers."). See also Ledoux, supra, at 1302. The Plan at issue in this case was indeed temporary; it was to last for 18 months, a factor which the District Court correctly interpreted as supporting the Plan's lawfulness. See Hammon v. Barry, 606 F.Supp. 1082, 1093 (D.D.C.1985).
 
 
 72
 Despite the majority's attempt to limit Johnson's damage to the Title VII affirmative action jurisprudence espoused in its prior opinion, the majority's construction of the law falls like a house of cards under the weight of the Supreme Court's holding. The majority contends that Johnson squares with its previous declaration that Title VII requires a "predicate of discrimination" before an employer may adopt an affirmative action plan. See Maj.Op. at 80-81. Indeed, the majority asserts that the Johnson Court agreed that "evidence of the effects of [an employer's] past or current discrimination is a prerequisite to lawful race-conscious employment decisions." Id. supra at 75 n.1. This statement totally misapprehends the factual setting of Johnson. There was absolutely no evidence of past or current discrimination by the employer in Johnson; in fact, the district court made an express finding that the employer had not discriminated in the past, and was not presently discriminating against women in regard to employment opportunities. See Johnson v. Transportation Agency, Santa Clara County, California, 770 F.2d 752, 758 & n. 4 (9th Cir.1984). For Title VII purposes, there need be no showing at all regarding the employer's past or current discrimination, although such a showing certainly strengthens the employer's justification for adopting an affirmative action plan. See Johnson, 107 S.Ct. at 1453 & n.11. The Court held in Johnson that it is sufficient for a public employer to show manifest statistical imbalance in its workforce to meet Title VII's requirement that the employer's affirmative action plan be remedial.
 
 
 73
 C. Application of Johnson to the Instant Case
 
 
 74
 Realizing that it can no longer censure the Plan based on its previous conclusion that there is no predicate of discrimination, the majority changes tacks and assails the statistics. The majority now concludes that no "manifest imbalance" exists in the racial composition of the District Fire Department. See Maj.Op. at 76-79. The court reaches this conclusion by the most incredible obliviousness to the essential facts and a wholly improper overriding of the District Court's findings. There is a manifest imbalance in the racial composition of the Fire Department's uniformed fireforce; there is a history of overt discrimination in the Department; there is evidence of recent discrimination, particularly regarding the disparate impact of the Department's entry level exam. I recounted this evidence in detail in my previous dissent and will not reiterate it here. See Hammon, 813 F.2d at 441-44. I am constrained, however, to respond to several of the majority's most recent fact-findings.
 
 
 75
 The majority's "finding" of no manifest imbalance in this case hinges on its assertion that the percentage of blacks in the District's fireforce should be compared to the racial composition of the "Washington metropolitan area," contrary to the District Court's explicit conclusion that this was not the appropriate benchmark for assessing minority representation in the Fire Department. Compare Maj.Op. at 77 with Hammon, 606 F.Supp. at 1091-92. It is obvious why the majority must hang its hat on this reference point: if any other figure is used, there is clearly a manifest racial imbalance in the Department's workforce. The majority's new position is illgotten.
 
 
 76
 Use of the Washington metropolitan area as the statistical basis for measuring minority representation in the Fire Department is improper, and the District Court wisely rejected it. As the majority notes, this area, which includes the suburbs surrounding Washington, is less than 30 percent black. Presumably the same suburbanites that are free to seek jobs with the Fire Department are free to seek jobs with other departments of the District government. Yet, curiously, the percentage of blacks in the District government generally has always closely approximated the percentage of blacks in the District workforce. Not so with the Fire Department (or, for that matter, the Police Department); there, blacks have always been grossly underrepresented. From 1964 to 1969, for example, the percentage of blacks among the District's total employees ranged from 50.3 to 60.7 percent respectively. Over the same time period, the percentage of blacks among uniformed firemen ranged from 14 to 19.2 percent respectively. More recently, in 1977, when D.C. Law 1-63 was passed, blacks comprised 67.4 percent of the District's employees overall, but only about 27 percent of the fireforce. If the court were examining the minority representation of the District's employees at large, there is no question that the Washington metropolitan workforce would not be the proper benchmark. See Payne v. Travenol Laboratories, Inc., 673 F.2d 798, 823-24 (5th Cir.), cert. denied, 459 U.S. 1038, 103 S.Ct. 451, 74 L.Ed.2d 605 (1982). It is quite obvious that there is no relationship bet the racial composition of the Washington metropolitan area and the racial composition of the District's employees. One can imagine the Silver Spring or McLean fire departments using the black population of the District to enlarge its minority hiring base. But the literature does not record that happening. The proper reference is not the Washington metropolitan area, despite the fact that traffic and commerce flow freely from the District to Maryland and Virginia. And why the great distinction in minority representation between the Fire Department and the District government at large? Surely, much has to do with the Fire Department's segregative practices, which continued into the early 1970's; with the discrimination in recruitment and hiring, of which the Department was found guilty in 1972; with the use of the apparently invalid Test 21 during the 1970's and, contrary to the majority's unsupported assertion, its apparent use as a rank-ordered selection technique. See Hammon, 813 F.2d at 433-35 (Mikva, J., dissenting). All these practices had adverse effects on minority hiring. By cavalierly asserting that the Washington metropolitan area is the relevant labor market and then concluding that minorities are overrepresented in the Fire Department, the majority adds gratuitous insult to grievous injury.
 
 
 77
 The history of black representation in the District government generally and the distortion between those historical figures and the history of minority representation in the Fire Department suggest that the District workforce would serve as a more appropriate benchmark for assessing whether there is a manifest imbalance in the racial composition of the Department. The majority off-handedly rejects this benchmark without discussing the compelling evidence that something was very much amiss in the Fire Department's hiring practices. See Maj.Op. at 78. Nor does the majority acknowledge that use of the local labor force as a reference appears to comport with the Supreme Court's analysis in Johnson. See 107 S.Ct. at 1446, 1447 n. 4 (comparing the percentage of women in the county agency's employ with the percentage of women in the general labor force of the county without inquiring whence the agency's employees actually hail). As I observed in my dissent from the majority's prior opinion, the imbalance is striking from this perspective: although blacks comprise over 65 percent of the local labor force, they comprise only 38 percent of the Department's uniformed force. See Hammon, 813 F.2d at 441-42.
 
 
 78
 In any event, the majority is unjustified in overturning the benchmark employed by the district court--the applicant pool--to which appellant, the Department of Justice, did not object below. See Hammon, 606 F.Supp. at 1091. The Supreme Court has explicitly endorsed the use of such an applicant pool as evidence of the relevant labor market. See Hazelwood School District v. United States, 433 U.S. 299, 308 n. 13, 97 S.Ct. 2736, 2742 n. 13, 53 L.Ed.2d 768 (1977). See also United States v. County of Fairfax, 629 F.2d 932, 940 (4th Cir.1980), cert. denied, 449 U.S. 1078, 101 S.Ct. 858, 66 L.Ed.2d 801 (1981). Since the early 1970's, the applicant pool has consistently been well over 55 percent black. In 1980, it rose to 74.53 percent; in 1984, 64.6 percent of the applicants were black. Yet, as late as 1984, only 37 percent of the District's fireforce was black. (In the 1970's the percentage averaged about 25. See Hammon, 813 F.2d at 435 (Mikva, J., dissenting).) It is ridiculous for the majority to herald the number of blacks hired by the Department between 1981 and 1984. See Maj.Op. at 76. The District was doing what the majority now forbids it from doing. The District's hiring during those years was directed by the District's Office of Human Rights, which had found that the 1981 test discriminated against blacks and had ordered the District to hire all of the applicants who passed the test; obviously, the percentage of blacks hired would mirror the percentage of black applicants. In adopting the Plan, the District is trying to do the exact same thing with regard to the 1984 test--avoid discriminating against minorities. The majority commends the District for the results of its most recent hiring practices and then condemns it for the practice. That is as absurd as it sounds. A fair comparison of either the applicant pool (the benchmark used by the district court and accepted by the parties) or of the area workforce to the Department's workforce reveals a manifest imbalance in the Fire Department's uniform fireforce. While Judge Silberman's statement mixes up the sources of the confusion, it matters not. Under either his "stock" or "flow" category, the imbalance is obvious. Both Judge Starr and Judge Silberman insist on using the one set of figures that does mix up the issue, namely, the percentage of new hires in 1984. That percentage is very high and very appropriate; it comes from the very plan that the majority strikes down. If Judge Starr and Judge Silberman think that percentage was such an admirable rate of hiring, I cannot understand why they want to keep the District from maintaining that level of hiring.
 
 
 79
 Under Johnson, such a manifest imbalance is a sufficient factual predicate to justify use of race-conscious employment practices. See Johnson, 107 S.Ct. at 1452; Ledoux, at 1302-03. But there is more evidence to support the District's adoption of the Plan. Thus, the remedial predicate in this case is far stronger than that evidenced in Johnson. Although the majority protests that it will not bury its head in the sand, ostrich-like, see Maj.Op. at 78 & n. 8, it has buried its whole corpus in ignoring, if not trivializing, the evidence of unlawful discrimination in the Fire Department, with which the District Court was, in its own words, "intimately familiar." Hammon, 813 F.2d at 435 (Mikva, J., dissenting) (citation omitted). The majority pretends that there have been happy times in the District's Fire Department since the time of the Korean Conflict. Those black firefighters subjected to the Department's humiliating overt discriminatory practices, such as separate beds and eating utensils, during the 1950's, '60's, and '70's; those black firefighters who instituted and won their discrimination charges against the Department in 1972; those black firefighters who during the 1970's, despite the fact that they had passed the entry-level exam, had to wait years later than nonminorities before being hired; those black applicants who experienced the District's unlawful use of an unvalidated exam in 1981; and those black firefighters who brought suit in 1984 in order to ensure that the Department would hire its fireforce in a manner that did not discriminate against minorities--all those black firefighters might understandably not recognize the pretty picture the majority paints. They weren't happy with the plantation, no matter how good the separate but equal food, no matter how comfortable the separate but equal sleeping facilities, no matter how seemingly well-intentioned the unequal hiring practices.
 
 
 80
 As a final point, I observe that the majority has wholly abandoned the second prong of Johnson's two-part test. After intoning the inquiry it must make--whether the employer's plan unnecessarily trammels the legitimate interests of nonminority employees, see Ledoux, at 1301--the majority simply states that because the District failed to consider available race-neutral alternatives, it cannot pass this second hurdle. See Maj.Op. at 81. The district court specifically found that there were no such alternatives available. See Hammon, 606 F.Supp. at 1093-94. We, as an appellate court, are in no position to engage in the fact-finding that would be necessary to overturn the lower court's finding. The majority's conclusion to the contrary is based primarily on an unsupported assertion made at oral argument. To the extent the majority located tests employed by fire departments that have been found valid for other jurisdictions, see Hammon, 813 F.2d at 429 n. 35, it cannot casually be presumed that the examinations are "portable" to the District. In any event, the majority's reasoning is irrelevant to the inquiry the Supreme Court has directed it to conduct. The Johnson Court did not require that there be no race-neutral alternatives available before an employer may voluntarily adopt an affirmative action plan; in fact, there was no discussion whatever in Johnson of possible alternatives to the Santa Clara plan. The Court did list several factors that are relevant to the court's inquiry, such as whether the plan creates an absolute bar to the advancement of nonminorities, is designed to attain (as opposed to maintain) racial balance, or deprives nonminorities of "legitimate firmly rooted expectation[s]." 107 S.Ct. at 1451, 1455. See also Ledoux, at 1301 (noting that, among other things, "the type of preferential remedy chosen by the employer is critical in determining whether the plan is unduly burdensome"). The majority fails to consider any of these factors, all of which support the Plan's lawfulness. See Hammon, 813 F.2d at 444-46 (Mikva, J., dissenting). Instead, the majority clings to a consideration which is not only unsound as a matter of fact, but, more importantly, totally irrelevant as a matter of law.
 
 CONCLUSION
 
 81
 The Supreme Court's opinion in Johnson makes it plain for almost all to see that the United States has failed to carry its burden in seeking to strike down the Fire Department's Plan. The Plan is designed to rectify past patterns of discrimination and to remove artificial and unnecessary barriers to employment; it goes but a small way toward remedying the underrepresentation of minorities in the District's uniformed fireforce by preventing the use of the 1984 entry level exam in a way that would discriminate against blacks. Despite the legitimate remedial purposes of the Plan's short-term goals, and without a mention of the burden of the Plan might or might not place on the legitimate interests of nonminority firefighters, the majority sees fit to strike down the District's attempts to rid its Fire Department of the vestiges of discrimination. The "cheery" times the majority trumpets have not arrived; indeed, the majority's opinion pushes them farther beyond the horizon. I dissent from the denial of the petition for rehearing.
 
 
 
 [1]
 In Justice O'Connor's view, as set forth in her concurring opinion in Johnson, affirmative action is permissible under Weber "only as a remedial device to eliminate actual or apparent discrimination or the lingering effects of this discrimination." Id. at 1461. Reiterating the Supreme Court's determination in Wygant v. Jackson Board of Education, 476 U.S. 267, 106 S.Ct. 1842, 1847, 90 L.Ed.2d 260 (1986), that societal discrimination alone is insufficient to justify a racial classification, Justice O'Connor reasoned that, in order to justify sex- or race-preferences, an employer must "point to evidence sufficient to establish a firm basis for believing that remedial action is required, [such as] a statistical imbalance sufficient for a Title VII prima facie case...." Id. at 1462. Although the majority rejected Justice O'Connor's prima facie case standard, id. at 1452-53 & nn. 10-11, it did not quarrel with her conclusion that, although an employer need not admit or prove that it had acted discriminatorily, evidence of the effects of its past or current discrimination is a prerequisite to lawful race-conscious employment decisions
 
 
 [2]
 Women constituted 36.4 percent of the area labor market and, in 1970, approximately 5 percent of the local labor pool of skilled craft workers
 
 
 [3]
 It should not go unnoticed that in its feverish reading of Johnson, the dissent glides over the "manifest imbalance" requirement without ever coming to grips with the fact that, in contrast to the "inexorable zero" in Johnson and the 1.83 percent representation in Weber, 37 percent of the District's firefighting force is black and an average of over 75 percent of new hires since 1981 have been black
 
 
 [4]
 The dissent charges that it is "ridiculous" for us to look to the percentage of blacks hired since 1981 because in exhausting the list of applicants who passed the 1981 test as directed by the Office of Human Rights, "[t]he District was doing what the majority now forbids it from doing." Dissent at 92. The charge is unfounded. In our previous opinion, we explicitly noted that as an alternative to use of a race-based quota, "the District could have exhausted the 1984 eligibility list." Hammon, 813 F.2d at 430. In addition, the charge is irrelevant, because the legality of the District's hiring methods prior to the AAP is not before us; the challenge that we address is only to the quota-regime under the AAP. Finally, we do not, as the dissent implies, condemn the District's overall aim of avoiding discrimination against minorities. To the contrary, we only find impermissible the means--a rigid quota based strictly on race--that the District has chosen to achieve that aim
 
 
 [5]
 The dissent's condemnation of what it perceives as "plantation" practices raises a fundamental conceptual issue (in addition to problems of appellate fact-finding, see infra text at 86 & note 9). Upon analysis, the "history" of segregative practices goes not to a hiring remedy at all, but to the entirely different (and thus far unlitigated) issue of whether vestiges of a prior, invidiously dual regime remain within the Fire Department. That is, the remedy for segregated institutions is to eliminate such invidious practices root and branch; thus the remedy for the pre-Brown educational regime in many States was not to admit black schoolchildren to school (for education was already being provided), but to cease and desist from making school assignments on racial lines. So too in the employment setting, the remedy for unlawful segregation practices is to obliterate those practices so that a "dual" Fire Department system will become a truly unitary system. Therefore, even if the dissent is right in its creative fact-finding, a hiring remedy is misplaced to the extent that the issue is one of segregative employment (as opposed to hiring) practices. The issue in hiring challenges is, instead, whether there is a manifest imbalance in a traditionally segregated job category
 
 
 [6]
 We cannot fail to note, in addition, that the District Court, in invoking the "vestiges of discrimination" talisman, failed entirely to address the question whether those "vestiges" amounted to the requisite "manifest imbalance." For this reason as well, we are constrained to conclude that legal error infected the District Court's analysis
 
 
 [7]
 The dissent nevertheless faults us for not employing the applicant flow data. The difficulty with the dissent's approach, however, is that it seeks to use recent applicant flow data to examine the overall composition of a department which has obviously been in existence (and engaged in hiring) for many years. The key analytically is to examine what hiring was done in the particular year(s) in question for which one is using applicant flow statistics. That is, there must be a nexus between applicant flow and the pertinent part of the hiring regime (or results thereof) under attack. Cf. United States v. County of Fairfax, 629 F.2d 932, 940 (4th Cir.1980), cert. denied, 449 U.S. 1078, 101 S.Ct. 858, 66 L.Ed.2d 801 (1981). See generally B. Schlei & P. Grossman, Employment Discrimination Law 1348-51 (2d ed. 1983). Obviously, if an applicant pool was historically 10 percent black, and the employer's workforce was approximately 10 percent black, then a latter-day upsurge in the minority component of the applicant flow would not serve suddenly to condemn what had previously been racially neutral practices. There must be balance, logic and common sense in these sensitive cases, which requires fact-finding and analysis of whether the recent applicant flow is representative of that in past years or whether it is skewed (by recent recruiting campaigns, for example, targeted at minority applicants). See id.; Hammon, 813 F.2d at 427-28 n. 31. Without the benefit of such fact-finding and analysis, we cannot accept a naked comparison of the percentage of blacks in the 1980 and 1984 applicant pools with the overall percentage of blacks in the entire Fire Department
 
 
 [8]
 Indeed, at last report, both traffic and commerce were moving freely between the District of Columbia and the thriving suburbs of Maryland and Virginia. To our knowledge, no Brandenburg Gate has yet been erected to prevent suburbanites from Silver Spring, Oxen Hill, or Alexandria from seeking employment in the D.C. Fire Department. And the much ballyhooed six-month residency requirement requires new hires to quit their former haunts and move into the District within six months after being hired. Until conditions change, we will not bury our heads in the sand, ostrich-like, by ignoring the metropolitan area whence the entry-level firefighters actually come
 
 
 [9]
 The same situation--clogged opportunities for admissions and government contracting--prevailed in the other two watershed cases, University of California Regents v. Bakke, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) and Fullilove v. Klutznick, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), as more fully recounted in our earlier opinion. Hammon, 813 F.2d at 423-24. While not confessing that which could not be believed--that the Fire Department here in Washington is a bastion of clogged hiring opportunities, a garden of noxiously "inexorable zeros"--the District rehearses, at length, its contention that discrimination existed in its Fire Department. District's Petition at 6-13. In our opinion, we responded in detail to the District's arguments. Hammon, 813 F.2d at 426-28. We can discern no warrant for revisiting those points here
 In addition, counsel for the Hammon plaintiffs argues, as she did previously, that pervasive discrimination exists now in the Fire Department, and that the Office of Human Rights administrative proceedings (discussed in detail in our prior opinion) were infected with fraud and misrepresentations. Hammon Plaintiffs' Petition at 3, 11-15. The dissent suggests that discrimination is indeed the order of the day. That is not, however, for us to say at this juncture. Instead, we reiterate our previously stated conclusion that our holding expressly leaves the door open for this issue to be raised before the District Court. Hammon, 813 F.2d at 432 n. 37.
 
 
 [10]
 At oral argument, counsel for the District of Columbia represented that the passing rate of a recent administration of the exam was much lower. This fact, obviously, was not before the District Court and, moreover, is irrelevant to the validity of the affirmative action plan under review, i.e., the plan approved by the District Court on the basis of the facts before it
 
 
 [11]
 Contrary to the dissent's assertion, apparently drawn out of the ether, that the quotas in the District's AAP were designed merely to reflect the racial composition of applicants who passed the 1984 exam, see Dissent at 89-90, the parties' Statement of Stipulated Material Facts expressly states that "The AAP was intended to achieve compliance with D.C. Law Sec. 1-63," which mandates that every agency of the District of Columbia government develop an affirmative action plan, with proportional representation of the available D.C. workforce (which is defined as persons in the District between the ages of 18 and 65) as its goal. Defendant's Appendix at 21. The District Court likewise observed that the AAP was created "in furtherance of the mandate of [D.C. Law Sec. 1-63]." Hammon, 606 F.Supp. at 1087-88
 In our earlier opinion, we held that the goal of a racially balanced workforce was an inadequate ground upon which to support the AAP. Hammon, 813 F.2d at 430-31. The District now contends that Johnson validates the use of such a goal. In Johnson, the affirmative action plan's long-term goal was "to attain a work force whose composition reflected the proportion of minorities and women in the area labor force." 107 S.Ct. at 1447. It was critical, however, that the long-term goal acted only as a "benchmark for measuring progress in eliminating underrepresentation." Id. at 1453. The employer in that case had "no intention of establishing a work force whose permanent composition is dictated by rigid numerical standards." Id. at 1457; see also id. at 1454. Indeed, Justice O'Connor in concurring characterized the goal as "merely a statement of aspiration wholly without operational significance." Id. at 1464.
 In the District's plan, in contrast, D.C. Law 1-63's goal of proportional representation played a pivotal role in shaping the AAP. According to the 1980 Census, 64.1 percent of individuals between the ages of 18 and 65 residing in the District are black. The AAP required that each academy class consist of at least 60 percent blacks. That percentage, mirroring almost exactly the percentage of blacks in the "workforce" defined by D.C. Law 1-63 (which, of course, represented only a portion of the area labor force), compels the conclusion that the goal of D.C. Law 1-63 was not merely aspirational, but to the contrary served as a guide for actual hiring decisions. This the Johnson Court did not countenance.
 
 
 [12]
 The District argues that in United States v. Paradise, --- U.S. ----, 107 S.Ct. 1053, 1070 n. 28, 94 L.Ed.2d 203 (1987), the Supreme Court held that alternatives to race-conscious measures need not be considered as long as no equally efficacious remedies are apparent. We emphatically disagree. In that case, the plurality concluded that, in light of the employer's blatant history of manifest foot-dragging and egregious discrimination, it was doubtful that an effective alternative to the race-conscious order existed. Id. Nothing in Paradise suggests that the Court abruptly jettisoned the hallowed value of stability in the law and abolished the theretofore well-settled requirement that alternatives to race-based measures be considered and, if possible, employed
 
 
 [1]
 The term has its origins in United States Steel Workers v. Weber, 443 U.S. 193, 197, 99 S.Ct. 2721, 2724, 61 L.Ed.2d 480 (1979), where the Court upheld a private employer's race-conscious affirmative action plan against a Title VII challenge because it was adopted in order to "eliminate manifest racial imbalances in traditionally segregated job categories." Id
 
 
 [2]
 There is no doubt that a cause of action exists to challenge the constitutionality of the plan. The question, however, is whether the Attorney General may, in the name of the United States, assert the rights of those third parties who would have a cause of action against the District. Although the federal government's right to sue is not determined using normal standing analysis, it is convenient to frame the issue in terms of standing. See 13A C. WRIGHT, A. MILLER & F. COOPER, FEDERAL PRACTICE AND PROCEDURE Sec. 3531.11 at 18 (1984)
 
 
 [3]
 But see In re Debs, 158 U.S. 564, 584-86, 15 S.Ct. 900, 906-07, 39 L.Ed. 1092 (1895); Brown v. Califano, 627 F.2d 1221, 1232 n. 67 (D.C.Cir.1980); United States v. City of Jackson, 318 F.2d 1, 11-16 (5th Cir.1963)
 
 
 [4]
 Judge Mikva objects to characterizing the District's affirmative action plan as seeking racial balance or proportional representation on grounds that the fire department seeks only 60% black hiring, and not 70%. See infra at 89 (Mikva, J., dissenting). I think the difference in this regard is insignificant. Suppose, for instance, the District's black quota was instead 65%, 68%, or 72%
 
 
 [5]
 I express no opinion on the merits of this case, now on appeal before this court
 
 
 [6]
 The District claims that its written objective test may have been legitimate for police officers but not for firefighters because the former have greater need to communicate and the test measures verbal skills. Although there is little evidence in the record on this point, anyone who has watched firefighters in action might view the District's argument skeptically
 
 
 [7]
 At least since 1980. See Hammon, 813 F.2d at 417
 
 
 [8]
 Although Judge Mikva does not explicitly discuss the constitutional claim, he does not conclude the government lacks standing to raise that issue, and he must therefore believe that the District's plan conforms to both Title VII and the Constitution
 
 
 [9]
 In his initial dissent, Judge Mikva argued that the "38%" (actually 37%) black representation in the Fire Department as compared with the 70% black composition of the District's workforce demonstrated discrimination. See Hammon, 813 F.2d at 441-42 (Mikva, J., dissenting); see also id. at 435. In his dissent to the denial of rehearing, however, Judge Mikva switches his statistics, claiming now that the 37% of blacks in the Fire Department, as compared to the 64.6% in the 1984 applicant pool, constitutes "manifest imbalance." See infra at 92. How this latter comparison shows "imbalance," I must confess, is beyond me, since in the same year 78.6% of the new hires were black--a hiring rate that exceeds the composition of blacks in the applicant pool. See Hammon, 813 F.2d at 418. In fact, Judge Mikva is mixing up what economists would describe as the "stock" and "flow" numbers
 
 
 [10]
 Judge Mikva's assumption, that any disparity in the percentage of blacks in the Fire Department is necessarily attributable either to discrimination or to black inferiority, is not only simplistic--it is wrong. See T. SOWELL, CIVIL RIGHTS: RHETORIC OR REALITY? 37-60 (1984); T. SOWELL, THE ECONOMICS AND POLITICS OF RACE 186-99 (1983); T. Sowell, Race and Economics 150-56 (1975). SEE GENERALLY T. SOWELL, ETHNIC AMERICA (1981)
 
 
 [11]
 In this regard, Justice Scalia might well be incorrect in assuming that only white males bear the costs of affirmative action preferences. See Johnson, 107 S.Ct. at 1476 (Scalia, J., dissenting)